DEEP SEA RESEARCH, INC., Plaintiff,

v.

The BROTHER JONATHAN, her appurtenances, furniture, cargo, etc., Defendant,

and

The State of California, State Lands Commission, and the United States of America, Intervening Defendants.

No. C 91–3899 LCB.

United States District Court, N.D. California.

March 16, 1995.

Injunction Issued April 5, 1995.

Stuart M. Gordon, Fletcher C. Alford, Gordon & Rees, San Francisco, CA, for Deep Sea Research, Inc.

Peter Pelkofer, Sr. Counsel, State of California, State Lands Com'n, Joseph C. Rosconi, Deputy Atty. Gen., State of Cal., Sacramento, CA, for State of Cal., State Lands Com'n.

Barbara B. O'Malley, Sp. Litigation Counsel, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for U.S.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is the restricted appearance and motion of intervening defendant, the State of California, State Lands Commission ("State"), to dismiss plaintiff Deep Sea Research, Inc.'s ("DSR") admiralty *in rem* action against defendant, the wreck of the *S.S. Brother Jonathan,* her appurtenances, furniture and cargo (collectively *"Brother Jonathan"*), for lack of subject matter jurisdiction. Also before the court is DSR's motion for a warrant for arrest of the *Brother Jonathan* pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3), and for a court order appointing DSR exclusive salvor of the vessel. For the reasons set forth below, the State's motion will be denied and DSR's motion will be granted.

## I. BACKGROUND

### A. Factual History

The *Brother Jonathan* is a 220 foot wooden-hulled, double side-wheeled steamship which was built in the middle of the last century. (Flohr Decl. at ¶ 4.) The vessel, which was owned by the California Steam Navigation Company, left San Francisco on Friday, July 28, 1865, bound for Portland,

Oregon and Vancouver. (Ex. C–1.) On board at the time were 109 passengers and 54 crew. (*Id.*) On Sunday, July 30, 1865, the *Brother Jonathan* struck a submerged rock · and sank off the coast of Northern California in the vicinity of Crescent City. (*Id.*) The ship went down in less than one hour, and only 16 persons survived. (*Id.*) When the ship sank, it was allegedly carrying valuable cargo, including a shipment of gold coin and bullion. (Flohr Decl. at ¶ 4.) Shortly after the *Brother Jonathan* sank, the San Francisco offices of five insurance companies paid claims totalling $48,490.00 for the loss of the vessel. (Ex. C–1.) It was estimated at the time, however, that approximately two-thirds of the ship's cargo was uninsured. (*Id.*)

More than 128 years later, in October of 1993, DSR located the wreck of the *Brother Jonathan* approximately four and one-half miles off the coast of Crescent City, California. (Flohr Decl. at ¶ 5; Siverts Decl. at ¶ 7.) The ship is resting upright on the sea floor in approximately 250 feet of water. (Siverts Decl. at ¶ 7.) A videotape taken of the wreck from a manned submersible confirms that the *Brother Jonathan* is largely intact— at least three-quarters of the ship's hull, and all of its surviving superstructure, floors, galley, cabins and other portions of the vessel, are clearly visible above the surface of the ocean floor.[1] (DSR Mot. for Issuance of Warrant of Arrest, Ex. B.) In addition, portions of the vessel's cargo, including dishware, are clearly visible resting on the sea floor. (*Id.*)

### B. *Procedural History*

#### 1. *DSR's Admiralty In Rem Action*

DSR has recovered several artifacts from the *Brother Jonathan,* including: two pieces of china; a corked, full champagne bottle; a medicine bottle; an ale bottle; and a brass spike from the ship's hull. (Flohr Decl. at ¶ 6.) Based on DSR's possession of these items, on April 1, 1994, DSR filed an admiralty *in rem* action stating a maritime claim against the wreck of the *Brother Jonathan*

under Federal Rule of Civil Procedure 9(h) and 28 U.S.C. § 1333. DSR is seeking an award of title to the ship and its cargo under the common law of finds or, alternatively, to a salvage award under the common law of salvage. DSR ·also asserts a right of ownership by purchase · of subrogation interests from the insurers of the vessel's original owner. At this time, however, DSR is seeking only a warrant for arrest of the *Brother Jonathan* pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3), and a court order appointing DSR exclusive salvor of the vessel.

#### 2. *The State's Motion to Dismiss*

On April 1, 1994, the State filed a restricted appearance and motion to dismiss DSR's *in rem* complaint for lack of subject matter jurisdiction. The State asserts that it has title to the *Brother Jonathan* under the Abandoned Shipwreck Act of 1987 ("ASA" or "Act"), 43 U.S.C. § 2101, *et seq.,* which gives states title to all abandoned shipwrecks which are embedded in their submerged lands, and all abandoned shipwrecks which are not embedded in the submerged lands of the state but are eligible for inclusion in the National Register of Historic Places ("National Register"). As an independent ground for ownership of the *Brother Jonathan,* the State asserts that it has title to the shipwreck under California Public Resources Code § 6313(a), which declares that the State has title to all abandoned shipwrecks, archaeological sites and historic resources resting on or in the submerged lands of the State. The State argues that the court lacks subject matter jurisdiction to proceed with this matter because the State has a "colorable claim" of ownership to the *Brother Jonathan,* therefore, DSR's *in rem.* action against the vessel is really an action against the State which is prohibited by the Eleventh Amendment to the United States Constitution.

DSR vigorously disputes the State's argument that it holds title to the *Brother Jonathan* under state and federal law, and that the court lacks jurisdiction to adjudicate the

---

1. The video portion of the tape was admitted into evidence at a hearing before the court on September 27, 1994. (Tr. 9/27/94 at 34–37, 39.) The audio portion of the tape, however, was ruled inadmissible. (*Id.*)

merits of DSR's claim because of the Eleventh Amendment. DSR maintains that the State does not have a colorable claim to the *Brother Jonathan* because: (1) California Public Resources Code § 6313 is preempted by federal admiralty law and the ASA; (2) the State does not hold title to the *Brother Jonathan* under the ASA because the *Brother Jonathan* is neither "abandoned" nor "embedded" within the meaning of the Act, and the Secretary of the Interior has not made a written determination that the *Brother Jonathan* is eligible for listing in the National Register; and (3) even if the *Brother Jonathan* is part of the class of shipwrecks protected by the ASA, the ASA is unconstitutional because it impermissibly divests the federal courts of their exclusive jurisdiction in admiralty and maritime matters pursuant to Article III, section 2, of the United States Constitution and 28 U.S.C. § 1333, and the ASA destroys the uniform application of admiralty law and maritime jurisdiction throughout the whole of the United States.[2]

The court held two hearings, on September 9, 1994 and September 27, 1994, to determine whether it had jurisdiction to proceed in this matter.[3] The first hearing focused on whether the *Brother Jonathan* was located within California's territorial sea.[4] During the second hearing, the State presented evidence in support of its claim that the *Brother Jonathan* is an abandoned shipwreck embedded in the submerged lands of the State. The State also presented testimony regarding the ship's eligibility for listing in the National Register.

Based on the evidence of record, and for the reasons set forth below, the court finds that the State has failed to demonstrate that it has a "colorable claim" to the *Brother Jonathan* under the ASA. The court also finds that California Public Resources Code § 6313 is preempted by § 7 of the ASA, which declares "[t]his chapter shall not change the laws of the United States relating to shipwrecks, other than those to which this chapter applies." 43 U.S.C. § 2106(b). Consequently, the law of admiralty applies to this action and the State's motion to dismiss will be denied.

## II. DISCUSSION

As a preliminary matter, the parties vigorously dispute the meaning of the term "colorable claim," and the evidentiary support necessary for the State to demonstrate the existence of a "colorable claim."[5] Since none of the circuits have squarely addressed this issue in a case with similar facts, the court will first attempt to identify the elements of a

---

**2.** After DSR challenged the constitutionality of the ASA, the United States intervened for the sole purpose of supporting the constitutionality of the Act.

**3.** The purpose of the two hearings was not to determine the merits of any party's claim to the *Brother Jonathan*, it was simply to determine whether the ASA and California Public Resources Code § 6313 apply to the *Brother Jonathan*. (Tr. 9/9/94 at 10.) If the statutes applied, then the State would have a "colorable claim" to the *Brother Jonathan* and the court would be divested of jurisdiction. *See Marx v. Government of Guam*, 866 F.2d 294 (9th Cir.1989); *Zych v. Wrecked Vessel believed to be the Lady Elgin*, 960 F.2d 665, 670 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 491, 121 L.Ed.2d 430 (1992) ("it is the existence, and not the strength, of the claim that activates the eleventh amendment."). Conversely, if the statutes did not apply, the court would retain jurisdiction to apply the laws of admiralty. 43 U.S.C. § 2106(b).

**4.** DSR has not disclosed the exact location of the *Brother Jonathan*. For the purpose of deciding the State's motion to dismiss, DSR has stipulated that the *Brother Jonathan* is located within California's territorial sea. (Tr. 9/27/94 at 3.)

**5.** In the context of shipwreck litigation, the term "colorable claim" is derived from Justice Stevens' comment in *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), that state officials named in a warrant of arrest for certain artifacts recovered from a 17th-century Spanish treasure ship acted without legitimate authority in withholding the property of the ship's salvors. After examining the basis of the state officials' arguments for retaining possession of the artifacts, and rejecting the State of Florida's argument that the Eleventh Amendment barred the execution of the warrant, Justice Stevens stated: "Thus, since the state officials do not have a *colorable claim* to possession of the artifacts, they may not invoke the Eleventh Amendment to block execution of the warrant of arrest." *Treasure Salvors*, 458 U.S. at 697, 102 S.Ct. at 3321 (emphasis added). Since *Treasure Salvors*, the term "colorable claim" has often been quoted out of context in shipwreck litigation, but it has never been defined.

"colorable claim." The court will then address the applicability of the ASA and its effect on the California Public Resources Code. Finally, the court will address DSR's motion for issuance of a warrant of arrest and motion to be declared exclusive salvor of the vessel.

## A. What is a "Colorable Claim"?

 The State, citing *Marx*, contends that its mere utterance of a claim to the *Brother Jonathan* under state or federal law makes it "colorable," and that the State need not prove that the laws actually apply to the vessel before the district court is divested of jurisdiction. The State is incorrect. First, the Ninth Circuit made no such holding in *Marx*, in which the parties' dispute arose before the effective date of the ASA, and the court refused to apply the terms of the new Act. *See Marx*, 866 F.2d at 295, 300. Second, the Ninth Circuit's more recent holding in *ITSI TV Productions v. Agricultural Assoc.*, 3 F.3d 1289 (9th Cir.1993), makes it clear that a party asserting sovereign immunity will have to at least prove, by a preponderance of the evidence, that the privilege applies. *See ITSI*, 3 F.3d at 1291–92 ("Like any other defense, that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance."). *See also Treasure Salvors*, 458 U.S. at 683–99, 102 S.Ct. at 3313–22 (where the Supreme Court first examined, and then rejected, state's claim of sovereign immunity); *Zych v. Unidentified, Wrecked and Abandoned Vessel, Believed to be SB "Seabird"*, 941 F.2d 525 (7th Cir.1991)

(remanding case to District Court to determine whether shipwreck was "embedded" and applicability of ASA). Thus, to establish the *existence* of a claim, the State must establish, by a preponderance of the evidence, that the ASA applies to the vessel at issue.[6] Once the existence of a "colorable claim" is established, the district court lacks jurisdiction to adjudicate the merits of the State's claim and the action must be dismissed. *Treasure Salvors*, 458 U.S. at 699–700, 102 S.Ct. at 3322.

To establish the existence of a "colorable claim" to a shipwreck under the ASA, the State, as the moving party, must demonstrate that the vessel is abandoned and embedded in the subsurface or coralline formations of the territorial waters of the State. *"Seabird"*, 941 F.2d at 530. If the shipwreck is abandoned but not embedded in the submerged lands of the State, the State must demonstrate that the Secretary of the Interior has included the shipwreck in, or has made a written determination that the shipwreck is eligible for listing in, the National Register.[7] *Id.* Once the State establishes that the ASA applies to an abandoned shipwreck, the federal court is divested of jurisdiction pursuant to 43 U.S.C. § 2106(a), and the question of title is settled by 43 U.S.C. § 2105(a) and (c). If a State alleges that it has a "colorable claim" to a shipwreck under state law, the State must demonstrate whether, and to what extent, its law regarding shipwrecks co-exists with, or is preempted by, the ASA. *See* 43 U.S.C. §§ 2103 and 2106(b). If both the ASA and state law are inapplicable, the federal court is not divested

---

6. This is especially true in cases where, as here, the federal courts retain exclusive jurisdiction to determine the controversy at issue. In this case, it is exclusively within the federal court's jurisdiction to determine whether the ASA applies, and whether a party has title to a shipwreck that has not been abandoned under the laws of admiralty. *See* 28 U.S.C. § 1333. If the court were to adopt the State's argument that the mere utterance of a claim makes it "colorable," and that the State has no burden of proving that the ASA applies, the plaintiff would be left without an adequate remedy at law. State courts simply do not have the jurisdiction to determine whether the ASA applies to a particular shipwreck, nor do they have jurisdiction to apply the laws of admiralty to competing claims of title.

7. The United States has encouraged the court to resolve the factual issues to determine the applicability of the ASA. In the memorandum that the United States filed in support of the constitutionality of the ASA, the government states:

> Several key factual issues must be resolved in order to determine whether the ASA even applies to THE BROTHER JONATHAN. DSR and the state disagree, for example, about whether THE BROTHER JONATHAN is within state territorial waters, whether it is embedded, and whether its original owners and successors in interest have abandoned it. Until these issues are resolved, it will not be clear whether the ASA applies to this shipwreck.

(United States Memo. at 6.)

of jurisdiction, and it may properly turn its attention to the merits of the plaintiff's claim in accordance with the laws of admiralty. *See* 43 U.S.C. § 2106(b).

**B. *The Abandoned Shipwreck Act of 1987***

On December 19, 1987, Congress enacted the ASA "to vest title to certain abandoned historic shipwrecks that are buried in State lands to the respective States and to clarify the management authority of the States for these abandoned historic shipwrecks." Pub.L. 100–298, 1988 U.S.Code Cong. and Adm.News at 365. Prior to the enactment of the ASA, tremendous confusion had arisen regarding whether states owned and had the authority to manage abandoned shipwrecks located in their territorial waters. *Id.* at 366.

In 1953, Congress enacted the Submerged Lands Act ("SLA"), 43 U.S.C. § 1301, *et seq.*, which gave states title to the natural resources located within three miles of their coastline. *Id.* With the growing popularity of SCUBA diving, and advances in underwater technology, there was a corresponding increase in the discovery of ancient shipwrecks off the coast of the United States. Many of these newly discovered shipwrecks were both historically significant and financially valuable. With the increased discovery of shipwrecks came increased controversy over whether the state upon whose land the shipwreck was located owned the vessel, or whether the individual who discovered the shipwreck obtained title to the vessel under the traditional laws of admiralty.

Between 1953 and 1987, at least 27 states enacted legislation asserting title to, and authority over, shipwrecks located in their territorial waters under authority allegedly granted to the states by the SLA. *Id.* The SLA, however, did not specifically include abandoned shipwrecks in its definition of "natural resources." [8] *Id.* When states attempted to assert title to shipwrecks claimed by salvors, a majority of the federal courts that considered the issue found: (1) the SLA did not specifically assert title to shipwrecks on behalf of the United States and then transfer that title to the states; and (2) state laws regarding shipwrecks whose provisions were inconsistent with federal common law admiralty principles were superseded by those principles under the Supremacy Clause of the Constitution. *Id.* at 366, 371 (*citing Cobb Coin Co. Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 525 F.Supp. 186 (S.D.Fla.1981); *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir.1978)). After lobbying by the states, Congress enacted the ASA to eliminate the confusion generated by this controversy. (State Memo. in Support of Restricted Appearance and Mot. to Dismiss at 7.)

Under § 6(a) of the ASA, the United States asserts title to three classes of shipwrecks: (1) abandoned shipwrecks that are embedded in the submerged lands of a state; (2) abandoned shipwrecks that are embedded in coralline formations protected by a state on its submerged lands; and (3) abandoned shipwrecks that are not embedded, but are located on the submerged lands of a state and are included in or determined to be eligible for inclusion in the National Register. 43 U.S.C. § 2105(a). Under § 6(b), the United States has transferred title to these shipwrecks to the states in or on whose submerged lands the shipwreck is located. 43 U.S.C. § 2105(c). Section 7(a) of the ASA specifically excludes these three classes of shipwrecks from the law of salvage and the law of finds, the two areas of maritime law traditionally applied by potential salvors to obtain title to shipwrecks. 43 U.S.C. § 2106(a). Section 7(b), however, expressly states that the ASA "shall not change the laws of the United States relating to shipwrecks, other than those to which [the Act] applies." 43 U.S.C. § 2106(b). Therefore, any shipwrecks that do not fit within the three classes of shipwrecks covered by § 6(a) remain subject to the traditional principles of admiralty law, and the federal courts retain exclusive jurisdiction to apply the laws of admiralty to these shipwrecks.

---

**8.** Under the SLA, the term "natural resources" includes oil, gas, and all other minerals, as well as marine animal and plant life. 43 U.S.C. § 1301(e).

### 1. The Brother Jonathan Is Not "Abandoned"

█ The ASA, by its terms, applies only to "certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101(b). The Act itself does not define the term "abandoned;" however, according to the regulations promulgated under the ASA, the term "abandoned shipwreck" means "any shipwreck to which title voluntarily has been given up by the owner with the intent of never claiming a right or interest in the future and without vesting ownership in any other person." 55 Fed.Reg. 50116, 50120 (Dec. 4, 1990). In addition, the regulations specifically exclude from the definition of "abandoned shipwrecks" vessels upon which insurance claims have been paid:

> When the owner of a sunken vessel is paid the full value of the vessel (such as receiving payment from an insurance underwriter) the shipwreck is not considered to be abandoned. In such cases, title to the wrecked vessel is passed to the party who paid the owner.

*Id.* at 50120–50121.

 The ASA's definition of "abandonment" generally follows established property law. It is well-settled, for instance, that abandonment is the voluntary relinquishment of one's rights to property. *Mucha v. King,* 792 F.2d 602, 610 (7th Cir.1986). Abandonment occurs "by an express or implied act of leaving or deserting property without hope of recovering it and without the intention of returning to it." 3A M. Norris, *Benedict on Admiralty* § 134 (7th ed. 1993). Additionally, it has long been the law that "[w]hen articles are lost at sea the title of the owner in them remains." *Columbus–America Discovery Group, Inc. v. Atlantic Mut. Ins. Co.,* 974 F.2d 450, 461 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993). Once an article has been lost at sea, "lapse of time and nonuser

are not sufficient, in and of themselves, to constitute an abandonment." *Id.* (citations omitted). "In addition, there is no abandonment when one discovers sunken property and then, even after extensive efforts, is unable to locate its owner." *Id.* (citations omitted). To show abandonment, a party must prove: (1) an intent by the original owner to abandon his property; and (2) physical acts carrying that intent into effect. *Id.* at 461, 464–65. The act of abandonment "must be proved by a clear and unmistakable affirmative act to indicate a purpose to repudiate ownership." *Id.* at 461 (citation omitted). Finally, the finding of abandonment must be supported by strong and convincing evidence. *Id.*

In this case, the State contends that the *Brother Jonathan* is abandoned because the vessel's owners have not attempted to salvage the vessel since 1865. On the other hand, DSR maintains that the *Brother Jonathan* is not abandoned because there has never been an affirmative act of abandonment on the part of the vessel's owners, and the technology did not exist to either find or safely salvage the vessel until recently. DSR also maintains that insurance claims were paid on the vessel in 1865; therefore, the insurers obtained title to the vessel through rights of subrogation. DSR asserts that it now holds title to the *Brother Jonathan* because the successors in interest to two of the vessel's original insurers have assigned their subrogation interests to DSR.

The only evidence that the State has presented on the issue of abandonment is the testimony of Rand Frank Herbert ("Herbert"), an historian, regarding the factual circumstances of the *Brother Jonathan's* sinking and the results of his research regarding salvage efforts and insurance claims paid for the loss of the vessel. (Herbert, Tr. 9/27/94 at 6.) During the September 27, 1994 hearing, Herbert testified, erroneously, that the *Brother Jonathan* was carrying between 200 and 225 passengers and 50 crew when it sank, and that 19 persons survived.[9]

---

9. During Herbert's direct testimony, the State offered Exhibit C–1 into evidence without objection. (Herbert, Tr. 9/27/94 at 17.) Exhibit C–1 is a copy of a newspaper article from the August 2, 1865 edition of the San Francisco Bulletin.

The article describes the circumstances surrounding the sinking of the *Brother Jonathan,* and it provides a list of the ship's 109 passengers and 54 crew. (Ex. C–1.) The article also lists insurance claim paid by five underwriters for the

(*Id.* at 10–11.) Herbert also testified that he was unable to locate any reference to salvage efforts undertaken by the ship's owners, but he did find references to other salvage attempts. (*Id.* at 12–14, 17–18.) Finally, Herbert testified that, although he found evidence that insurance claims were paid for the loss of the vessel, he was unable to determine from his research which portion of the ship or its cargo was covered by insurance. (*Id.* at 15–17.)

During cross-examination, Herbert admitted that he was retained by the State just eight days before the *second* hearing, despite the fact that the State had more than five months to prepare for the court's hearing on its motion to dismiss. (*Id.* at 21.) Herbert testified that he conducted just 22 hours research, which consisted almost entirely of reviewing newspaper articles during three visits to the library. (*Id.* at 21–22, 23.) He admitted that he did not research any insurance records, nor did he attempt to contact any of the underwriters who paid claims for the loss of the *Brother Jonathan.* (*Id.* at 25–26.) Herbert also admitted that he did not know, one way or another, whether the owner of the *Brother Jonathan* or the insurance underwriters attempted to salvage the vessel. (*Id.* at 23–24, 26.) More importantly, Herbert admitted that he did not find any evidence that the owner of the *Brother Jonathan,* or the insurance underwriters, had publicly disclaimed any further ownership interest in the vessel. (*Id.* at 22.)

Herbert's testimony, by itself, does not provide a sufficient basis for the court to conclude that the owners of the *Brother Jonathan* have taken a "clear and unmistakable affirmative act to indicate a purpose to repudiate ownership" in the *Brother Jonathan,* or its cargo. In addition, the State has failed to provide sufficient evidence to demonstrate that the *Brother Jonathan* has been abandoned due to the lapse of time, or because the owners of the vessel have failed to undertake salvage efforts.

The facts of this case are similar to two recent cases where courts have been called upon to decide the issues of abandonment and competing claims of ownership in the era of insurance: *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 742 F.Supp. 1327 (E.D.Va.1990), *rev'd,* 974 F.2d 450 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); and *Zych v. Unidentified, Wrecked and Abandoned Vessel, Believed to be SB "Lady Elgin",* 755 F.Supp. 213 (N.D.Ill.1991), *rev'd on other grounds,* 960 F.2d 665 (7th Cir.1992).

In *Columbus–America,* a consortium of insurance companies filed competing claims of ownership against a salvor who discovered the *S.S. Central America,* a wooden-hulled, side-wheeled steamship which sank 160 miles off the coast of South Carolina in 1857. The District Court held that the successors in interest to the original insurance companies who paid claims for the loss of the vessel obtained ownership interests in the *S.S. Central America* and its cargo by right of subrogation, but the insurance companies affirmatively abandoned their ownership interests by failing to undertake salvage efforts and deliberately destroying certain documentation. 742 F.Supp. at 1343–48. Applying the common law of finds, the court held that the salvor was entitled to, and vested with, ownership of all of the cargo and artifacts recovered from the *S.S. Central America. Id.* at 1348.

On appeal, however, the Fourth Circuit held that the insurers' abandonment could not be presumed due to inaction because it was not technologically feasible to salvage the vessel until recently. 974 F.2d at 461–68. The appellate court found that the law of finds is properly applied in situations where the previous owners are found to have abandoned their property, but such abandonment must be proven by clear and convincing evidence, such as an owner's express declaration that he is abandoning title.[10] *Id.* at 464.

loss of the vessel. (*Id.*) It also states, without any additional explanation, that "[p]robably two-thirds of the cargo was uninsured." (*Id.*)

**10.** The Fourth Circuit stated:

Should the property encompass an ancient and long lost shipwreck, a court may infer an abandonment. Such an inference would be improper, though, should a previous owner appear and assert his ownership interest; in such a case the normal presumptions would apply

The Fourth Circuit held that the District Court erred when it found an abandonment and applied the law of finds. *Id.* at 468. Therefore, the Fourth Circuit remanded the case to the District Court with instructions to hold a trial to determine the value of the cargo insured by each underwriter, and to determine the proper salvage award for the plaintiff. *Id.*

In the *Lady Elgin* case, two parties asserted competing claims to the wreck of the *Lady Elgin,* a 300 foot side-wheeled steamship which sank in Lake Michigan in 1860. The finder of the *Lady Elgin* asserted title to the vessel under the law of finds, arguing that the underwriter who originally paid claims for the loss of the *Lady Elgin* effectively abandoned the vessel through the lapse of time and by its failure to take any steps to recover the vessel. At the same time, a charitable foundation that obtained an ownership interest in the *Lady Elgin* from the successor to the original insurance underwriter disputed the salvor's claim that the ship was abandoned, arguing that the original underwriter instructed its agents not to abandon the vessel, and, therefore, never intentionally surrendered its interest as subrogee of the vessel's owner. The District Court agreed with the foundation, finding that the underwriter's documents showed a specific intent not to abandon the vessel, and that the underwriter's failure to attempt salvage efforts was excusable because the technology did not exist to recover the wreck until the late 1980s. 755 F.Supp. at 217. The court stated:

> In light ... of the law's hesitancy to find abandonment and the concomitant requirement that abandonment be supported by strong and convincing evidence, the Court finds that [the underwriter] was not required to engage in efforts to recover the wreck in order to avoid abandoning its

interest when such efforts would have had minimal chances for success.[11]

*Id.*

In this case, the state of the art technology necessary to accurately locate the *Brother Jonathan,* or to safely salvage the vessel at a depth of 250 feet, did not exist until just recently. (Jackson Decl. at ¶¶ 4–5; Groom Decl. at ¶¶ 4–5.) Within the last three years, advances in sonar technology have made it possible to locate shipwrecks in deep water with greater precision, and for less money, than with the technology that was previously available. (Groom Decl. at ¶¶ 4–5.) Also within the last three years, scientific advances in the use of mixed breathing gasses to combat decompression sickness have increased the safety factor in diving at great depths. (Jackson Decl. at ¶¶ 4–5.) As in the *Columbus–America* and *Lady Elgin* cases, the owners of the *Brother Jonathan* and its cargo were not required to engage in efforts to recover the wreck in order to avoid abandoning their interests when such efforts would have had minimal chances for success. The mere fact that the owners of the *Brother Jonathan* have not undertaken salvage efforts, if it is true, does not provide sufficient evidence for the court to conclude that the *Brother Jonathan* has been legally abandoned.

As an alternative theory of abandonment, the State argues that, because a newspaper article published in 1865 stated "[p]robably two-thirds of the cargo was uninsured," and the owners of the uninsured cargo have not come forward to date, the uninsured portion of the *Brother Jonathan's* cargo has been abandoned due to the lapse of time. The State also asserts that the personal property of the passengers and crew has been abandoned for the same reason. The State claims an ownership interest in the uninsured cargo and personal property under California Public Resource Code § 6313.

and an abandonment would have to be proved by strong and convincing evidence. *Id.* at 464–65.

**11.** On appeal, the Seventh Circuit agreed with the District Court's finding regarding abandonment. The Seventh Circuit, however, reversed

the District Court's later decision to issue an injunction against "all-the-world," holding that the injunction potentially was a judgment against the State of Illinois in violation of the Eleventh Amendment. *Lady Elgin,* 960 F.2d at 670.

While the State is correct in its assertion that the court may infer abandonment of cargo and personal property if an owner fails to appear in court, at this time, based on the showing that the State has made, it would be premature for the court to find that any individual items of cargo or personal property have been abandoned. At this stage in the litigation, DSR is not asking the court to award it salvage fees from the *res* of the wreck, or to otherwise make any order regarding title to or distribution of the wreck or its contents. (DSR Memo. of Points and Authorities in Support of Mot. for Issuance of Warrant of Arrest at 3, n. 2.) DSR is currently seeking only a warrant for arrest of the vessel and an order appointing DSR custodian of the wreck. (*Id.*) DSR has suggested that any final determination regarding title should be made after the salvage operation is completed. (*Id.*) The court agrees that this is the most prudent way to proceed with the case at this time. To date, there has been very little publicity generated by the discovery of the *Brother Jonathan,* and only a few artifacts have been recovered. Upon the issuance of a warrant for arrest of the vessel, DSR will be required to publish notice of this action and the arrest in a newspaper of general circulation. Supplemental Admiralty and Maritime Claims Rule, C(4). In addition, any future salvage operations will undoubtedly generate additional publicity, and it is likely that this publicity will cause additional claimants to come forward.[12]

At this time, the State has failed to demonstrate that it has a colorable claim to any cargo or personal property which ultimately may be found to be abandoned. The State's assertion that any abandoned personal property and uninsured cargo automatically becomes the property of the State is incorrect. As is discussed in Section II.B.4., *infra,* § 6313 is preempted by the ASA. More importantly, the ASA does not support the State's theory that the State obtains title to an entire shipwreck if a portion of its contents are found to be abandoned, but the entire ship is not otherwise abandoned and embedded.[13] The State does not cite to any case law to support its argument, and the court is not aware of any if it exists. In fact, in another case with similar facts, the State of Florida's argument that it could declare title to abandoned property under the sea through legislative pronouncement was rejected by the court. *See Cobb Coin,* 525 F.Supp. at 198, 215–16.

In sum, after considering all of the evidence, the court finds that the State has failed to produce sufficient evidence to demonstrate that the *Brother Jonathan* is legally abandoned.

### 2. *The Brother Jonathan Is Not "Embedded"*

██ The second class of shipwrecks protected by the ASA are abandoned shipwrecks that are embedded in either the submerged lands of a state, or in coralline formations that are protected by the state.[14] 43 U.S.C. § 2105(a). The ASA defines the term "embedded" as:

---

12. At this stage in the litigation, only DSR and the State have asserted claims to the *Brother Jonathan.* In other shipwreck cases, and especially in cases where vessels carried valuable cargo or were lost during the era of insurance, additional parties have intervened in federal court to assert competing claims to the wreck. *See, infra, Columbus–America* (competing claims asserted by consortium of insurance underwriters, heir to Miller Brewing fortune, Texas millionaire, Ivy League university, and Order of Catholic monks) and *Lady Elgin* (competing claim asserted by a charitable foundation that obtained insurance underwriter's subrogation interest). DSR already has obtained the subrogation interests of two insurance companies; therefore, it should be shielded from claims from these potential claimants. However, due to the *Brother Jonathan's* proximity to shore, its notori-

ety, the purported value of its cargo, and the relatively recent date of its sinking, DSR could potentially face competing claims from the heirs of those lost at sea and from competing salvors.

13. Under the ASA, the term "shipwreck" means any vessel or wreck, its cargo, and other contents. 43 U.S.C. § 2102(d). The ASA, however, does not provide for the apportionment of a ship's contents.

14. In this case, the State does not allege that the *Brother Jonathan* is embedded in coralline formations protected by the State. Therefore, the court will confine its analysis to whether the State has demonstrated that the *Brother Jonathan* is embedded in the submerged lands of the State.

firmly affixed in the submerged lands or in coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof[.]

43 U.S.C. § 2102(a).

According to the regulations promulgated under the ASA:

Tools of excavation would include, but would not be limited to, hydraulic, pneumatic, or mechanical dredges; explosives; propeller wash deflectors; air lifts; blowtorches; induction equipment; and mechanical tools used to remove or displace bottom sediments or coralline formations to gain access to shipwrecks.

55 Fed.Reg. at 50121.

During the September 27, 1994 hearing, the State presented the testimony of John W. Foster ("Foster"), the senior archaeologist for the California Department of Parks and Recreation, on the issue of whether the *Brother Jonathan* is embedded. Foster testified that, based solely on his observation of DSR's videotape of the wreck, he believes the *Brother Jonathan* is embedded in the sea floor. (Foster Tr. 9/27/94 at 39–40.) Foster testified that the hull of the *Brother Jonathan* is buried up to the level of the vessel's copper sheathing, which formerly extended to the waterline of the ship, and is now visible above the sea floor. (*Id.* at 40.) According to Foster, this indicates that "a significant amount of the hull is actually buried in the seabed itself." (*Id.*)

During cross-examination, however, Foster admitted that a substantial portion of the *Brother Jonathan* is located above the ocean floor. (*Id.* at 42.) He also admitted that the superstructure of the wreck is covered only by a fine layer of silt which can be easily removed by the wave of a diver's hand. (*Id.*) Finally, Foster admitted that he does not know anything about the consistency of the sea floor in the area of the *Brother Jona-*

*than,* or whether the vessel is resting on loose or hard sediment. (*Id.* at 42–43.)

Foster's testimony, by itself, is insufficient to establish that tools of excavation are *required* to gain access to the wreck. In fact, the weight of the evidence does not support Foster's brief testimony on this issue. For instance, an examination of DSR's videotape reveals that the *Brother Jonathan* is not embedded in the sea floor. (*See* DSR Mot. for Issuance of Warrant of Arrest, Ex. B; Siverts Decl. at ¶ 8; Bascom Decl. at ¶ 4; Slater Decl. at ¶ 5.) In fact, when the videotape is viewed in its entirety, it appears that the *Brother Jonathan* has merely settled on to the sea floor.[15] (DSR Mot. for Issuance of Warrant of Arrest, Ex. B.) At least three-quarters of the ship's hull, including all of its surviving superstructure, floors, galley, cabins and other portions of the vessel, are clearly visible above the surface of the ocean floor. (*Id.*) A large section of the vessel's copper sheathing also can be seen waving in the current. (*Id.*) Additionally, large portions of the ship's cargo, including dishware, are clearly visible resting on the sea floor. (*Id.*)

Moreover, according to Don Siverts ("Siverts"), the underwater surveyor who videotaped the shipwreck, the *Brother Jonathan* is not embedded in the ocean floor. (Siverts Decl. at ¶ 8.) In a declaration dated April 20, 1994, Siverts states that the lower portions of the ship's hull are not visible on the videotape because they appear to have deteriorated and collapsed, and are now resting on top of the ocean floor. (*Id.*) Siverts also states that while videotaping the *Brother Jonathan,* he "saw down into the hull, and the interior of the vessel did not appear to contain any significant amount of sand, mud, or dirt." (*Id.* at ¶ 9.) Finally, Siverts declared that although the aft section of the *Brother Jonathan* was covered by a layer of sediment during the time that he observed it, the sediment was only one or two inches deep, it was fine, loose and powdery, and it could be

15. Any 220 foot wooden vessel weighing several hundred tons will inevitably settle into the bottom after 128 years. Settling into the bottom, however, does not mean that the vessel is wholly or even partially embedded such that tools of

easily displaced by a human hand.[16] (*Id.* at ¶ 10.)

After examining all of the evidence, the court finds that the State has failed to demonstrate by a preponderance of the evidence that the *Brother Jonathan* is firmly affixed in the submerged lands of the State such that tools of excavation are required to move the bottom sediments to gain access to the ship or its cargo. Thus, the State has failed to demonstrate that the *Brother Jonathan* is "embedded" as defined by the ASA.

### 3. *The Brother Jonathan Has Not Been Determined to be Eligible for Listing in the National Register*

■ The third class of shipwrecks covered by the ASA are abandoned shipwrecks that are not embedded, but are located on the submerged lands of a state and are included in or determined to be eligible for inclusion in the National Register. 43 U.S.C. § 2105(a). In this case, the *Brother Jonathan* is located on the submerged lands of the State of California but it has not been included in or determined to be eligible for inclusion in the National Register.

According to the regulations promulgated under the ASA, "in order for the United States to assert title to any abandoned shipwreck, the shipwreck must be listed in or determined eligible by the Secretary of the Interior for listing in the National Register." 55 Fed.Reg. at 50121, n. 2. When a question exists as to the historical significance of a shipwreck that is not included in or determined to be eligible for inclusion in the National Register, any person may make a request to the Secretary of the Interior for a written determination of the shipwreck's eligibility for inclusion in the National Register. *Id.* at 50121. Once a request for a determination of historical significance has been made, the Secretary of the Interior will determine whether the particular shipwreck meets the criteria for eligibility set forth in 36 C.F.R. § 60.4. *Id.*

In this case, the State has never requested that the Secretary of the Interior determine the historical significance of the *Brother Jonathan.* (Herbert, Tr. 9/27/94 at 24–25; Foster, Tr. 9/27/94 at 43–44, 46.) During the September 27, 1994 hearing, Foster, the State's marine archaeologist, testified that the State conducted some historical research on the *Brother Jonathan* in 1983, but it has not done anything else since then.[17] (Foster, Tr. 9/27/94 at 43–44.) According to Foster, the State has not requested a determination of the *Brother Jonathan's* historical significance because the State has not known the location of the wreck. (*Id.* at 46.) But Foster admitted that the State has done nothing to ascertain the location of the *Brother Jonathan.* (*Id.*) Moreover, Foster's testimony is contradicted by the affidavit of Goodyear K. Walker ("Walker"), an environmental specialist employed by the State Lands Commission. In his affidavit, which is dated December 20, 1991, Walker states that he plotted the location of the *Brother Jonathan* in 1988, and included this information in the State Lands Commission's "Calwreck" computer database. (Walker Dec. at ¶ 3.) Additionally, in the memorandum that the State filed in support of its restricted appearance and motion to dismiss on April 1, 1994, the State confidently declares:

excavation are required to gain access to the wreck.

16. Siverts' declaration is further supported by the declarations of Willard Bascom and Richard Slater, both of whom testified that, after examining the videotape of the wreck, they believed that tools of excavation are not required to gain access to the wreck. (Bascom Decl. at ¶ 4; Slater Decl. at ¶ 5.)

17. The State did not present any documentary evidence at the September 27, 1994 hearing to support its claim that the *Brother Jonathan* is eligible for listing in the National Register. While the State's expert witness testified that he believed the *Brother Jonathan* had the "integrity" necessary for listing, he never defined this term. In fact, the State never discussed in detail the criteria for eligibility set forth in 36 C.F.R. § 60.4, nor did it explain how the *Brother Jonathan* satisfied these criteria. Moreover, the State never even presented the research that it conducted on the *Brother Jonathan* in 1983. Without any supporting documentation, the weak and unsubstantiated testimony of Foster is simply insufficient to satisfy the State's burden of proving that the Secretary of the Interior has made a written determination that the *Brother Jonathan* is eligible for listing in the National Register.

The ship lies embedded in the bottom surface in some 200 feet of water at latitude: 41 deg. 47' 20" N, longitude: 124 deg. 20' 46" W, approximately 3 and ½ miles west of Point St. George and within the State's territorial or marginal sea.[18]

(State Memo. in Support of Restricted Appearance and Mot. to Dismiss at 4, 8.)

Also, in its reply brief to DSR's motion for issuance of a warrant for arrest, the State declares:

The State has similarly been aware of the existence of the *Brother Jonathan* for many years. As long ago as 1969, the State issued a permit for salvage of the vessel to the Brother Jonathan Company. (Official files of the State Lands Commission W–8892, W–8893, W–8894). Extensive information including its location is contained in the State Lands Commission files and on its "Calwreck" database.

(State Reply Br. at 4.)

In light of the State's repeated declarations that it has known the location of the *Brother Jonathan* for several years, Foster's testimony that the State could not seek a determination of the historical significance of the *Brother Jonathan* because the State did not know the location of the wreck is simply wrong. By its own admission, the State has known, or thought that it knew, the location of the *Brother Jonathan* for many years. The State's failure to seek a determination of the *Brother Jonathan's* historical significance cannot now be excused because the State recently learned that it may have been mistaken in its knowledge of the location of the wreck. Moreover, if the *Brother Jonathan* were really as historically significant as the State claims it to be, it seems incredible that the State would allow more than ten years to elapse without so much as attempting to seek

a written determination of the wreck's historical significance.[19]

Since the *Brother Jonathan* is not included in or determined to be eligible for inclusion in the National Register, and the State has never requested that the Secretary of the Interior determine the historical significance of the *Brother Jonathan,* the court finds that the *Brother Jonathan* does not fall within the third class of shipwrecks protected by the ASA.

**4. The State Has Failed to Demonstrate the Existence of a "Colorable Claim" to the Brother Jonathan under the ASA**

Because the State has failed to provide any evidence to establish that the *Brother Jonathan* is an abandoned shipwreck which is embedded in the submerged lands of California, or that the *Brother Jonathan* is an abandoned shipwreck and the Secretary of Interior has determined that the vessel is eligible for listing in the National Register, the court finds that the State has failed to demonstrate the existence of a "colorable claim" to the *Brother Jonathan* under the ASA.

**C. California Public Resources Code § 6313 is Preempted by the ASA**

In 1989, the California legislature enacted California Public Resources Code § 6313, which asserts that the State has title to a much broader class of shipwrecks than those whose title is transferred to the states under the ASA. Section 6313(a) declares:

The title to all abandoned shipwrecks and all archaeological sites and historic resources on or in the tide and submerged lands of California is vested in the state.

Cal.Pub.Res.Code § 6313(a).

Section 6313(b) further declares:

As used in this section, "submerged archaeological site" and "submerged historic

18. In support of an earlier motion to intervene, the State filed the affidavit of Roy H. Minnick ("Minnick"), the Supervisor of the State Lands Commission's Land Location and Boundary Section. Minnick states that he was given the location described above by counsel so that he could determine whether the *Brother Jonathan* was located within California's territorial sea. (Minnick Aff. at 3.) Minnick's affidavit is dated December 23, 1991. (*Id.* at 4.)

19. Interestingly, during the September 27, 1994 hearing, the State asked its historical consultant, Frank Herbert, whether he had an expert opinion about the historical significance of the *Brother Jonathan.* (Herbert, Tr. 9/27/94 at 18.) Herbert would not say that the *Brother Jonathan* is historically significant. In fact, after some hesitation, Herbert would only say that the *Brother Jonathan* is "famous." (*Id.*)

resource," shall be given the broadest possible meaning, to include any submerged object, structure, building, watercraft, or vessel and any associated cargo, armament, tackle, fixture, human remains, or remnant thereof, or any site, area, person, or place, which is historically or archaeologically significant, or significant in the prehistory or history or exploration, settlement, engineering, commerce, militarism, recreation, or culture of California and which is partially or wholly embedded in or resting on state submerged or tidal lands. Cal.Pub.Res.Code § 6313(b).

In addition, § 6313(c) declares: Any submerged archaeological site or submerged historic resource remaining in state waters for more than 50 years shall be presumed to be archaeologically or historically significant. Cal.Pub.Res.Code § 6313(c).

DSR argues that § 6313 of the California Public Resources Code is preempted by § 7 of the ASA, 43 U.S.C. § 2106(b). DSR is correct. There are three instances where state law will be preempted by federal law: (1) where a federal statute or regulation includes language expressly preempting state action in a given area; (2) where state action is implicitly preempted where the intent of Congress is clearly manifested, or implicit from a pervasive scheme of federal regulation that leaves no room for state or local supplementation, or implicit from the fact that federal law touches a field in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and (3) where an actual conflict exists between state and federal law. *Barber v. Hawaii,* 42 F.3d 1185, 1189 (9th Cir.1994) (citations omitted).

In this case, there can be no doubt that § 6313, insofar as it asserts title to ship-wrecks that are not covered by the ASA, is preempted by the ASA. Section 7 of the ASA clearly states that the Act "shall not change the laws of the United States relating to shipwrecks, other than those to which this chapter applies." 43 U.S.C. § 2106(b). In addition, the legislative history of the ASA declares:

> The [Congress] intends to carve out a limited exception from general admiralty principles for those classes of shipwrecks to which this Act applies. All other ship-wrecks, including those in federal waters, remain subject to the uniform principles of admiralty law, except as may be provide in other federal law.

Pub.L. 100–298, 1988 U.S.Code Cong. and Adm.News at 377. Congress only intended to transfer ownership and ensure protection of shipwrecks of "historic significance," which it estimated to be a mere five to ten percent of the 50,000 abandoned shipwrecks thought to be located in the navigable waters of the United States. *Id.* at 365. Thus, § 6313 is superseded by the first two instances of preemption, where the federal statute includes language expressly preempting state action in a given area, and where state action is implicitly preempted because federal admiralty law is so dominant that it will be assumed to preclude enforcement of state laws on the same subject.[20]

Finally, it is clear that an actual conflict exists between state and federal law. The ASA declares that the United States asserts title to only abandoned shipwrecks that are embedded in the submerged lands of a state, or, if they are not embedded, where they are determined to be eligible for listing in the National Register, and the United States transfers its title to these shipwrecks to the state in or on whose submerged lands the shipwreck is located. Section 6313 of the California Public Resources Code, however, declares that title to any shipwreck, or portion thereof, that has been resting in California waters for more than fifty years is vested in the State. Section 6313's broad claim of title plainly conflicts with the title to ships transferred to the states under the ASA.

Both the language and history of the ASA make it clear that Congress intended the federal courts to retain admiralty jurisdiction over shipwrecks that are not part of the

---

**20.** Article III, section 2 of the United States Constitution confers upon the federal courts "all Cases of admiralty and maritime Jurisdiction." This jurisdiction is exclusive to the federal courts pursuant to 28 U.S.C. § 1333(1).

specifically defined class of shipwrecks protected by the ASA. Nothing in the ASA gives states the authority to assert title to shipwrecks that are not covered by the Act. In fact, nothing in the ASA gives states the authority to assert title to *any* shipwreck, or any part thereof.[21] Instead, as Congress intended, the ASA asserts title to a certain class of abandoned shipwrecks on behalf of the United States, transfers title to these, and only these, shipwrecks to the states, and retains federal jurisdiction over all other shipwrecks. *See* 43 U.S.C. §§ 2105(a) and (c), and 2106(b). Thus, § 6313 of the California Public Resources Code, insofar as it asserts title to shipwrecks that are not covered by the ASA, is preempted by the ASA.[22] Additionally, because § 6313 of the California Public Resources Code is preempted by the ASA, the court finds that the State's alternative claim of title is without merit.

## D. *The Constitutionality of the ASA*

Because the court finds that the ASA does not apply to the *Brother Jonathan*, and that California Public Resources Code § 6313 is preempted by the ASA, the court need not determine whether the ASA is constitutional. *See "Seabird"*, 941 F.2d at 532 (*citing Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936). The court notes, however, that if § 6313 of the California Public Resources Code were not preempted by the ASA, the validity of the California law could provide strong evidence that the ASA destroys the uniformity of ad-

miralty and maritime law throughout the whole of the United States. *See Panama R. Co. v. Johnson*, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924). The ASA does not give individual states the authority to enact legislation to assert title to virtually all shipwrecks in their territorial waters. If it did, there would be one exception to 28 U.S.C. § 1333 for every state with a territorial sea. This would clearly be a violation of Article III, section 2, of the Constitution of the United States.

## E. *DSR's Admiralty In Rem Action*

Because the State has failed to demonstrate the existence of a "colorable claim" to the *Brother Jonathan* under federal or state law, the court has subject matter jurisdiction over DSR's admiralty *in rem* action pursuant to Article III, section 2, of the Constitution of the United States, and 28 U.S.C. § 1333. DSR has brought this action invoking the court's admiralty and maritime jurisdiction by stating a maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure. The court has jurisdiction *in personam* over DSR and over any claimant who may intervene in this action in the future. *See Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 566–68 (5th Cir.1981) (*Treasure Salvors III* ). The court also has jurisdiction *in rem* over the *Brother Jonathan* because it is located within the territorial waters of the State of California.[23] *Treasure Salvors III*, 640 F.2d at 566–68.

At this time, DSR has moved for the issuance of a warrant of arrest of the *Brother Jonathan*, her appurtenances and cargo, pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3). DSR also has

**21.** In fact, under the ASA, states are only given the authority to develop "legislation and regulations to carry out their responsibilities under [the Act]." 43 U.S.C. § 2104(c). Section 6313's broad assertion of title to all shipwrecks and cargo remaining in State waters for more than fifty years old goes far beyond the authority granted by the ASA.

**22.** To the extent that subsections (d) through (i) of § 6313 apply only to abandoned shipwrecks that have been transferred to the State under 43 U.S.C. § 2105(c), these subsections shall remain valid. *See* 43 U.S.C. § 2103(a)(2)(C). These subsections, however, shall not apply to shipwrecks

that have not been transferred to the State under 43 U.S.C. § 2105(c).

**23.** Even if the *Brother Jonathan* is located outside of the territorial waters of the State of California, the court would have *quasi in rem* jurisdiction over the shipwreck because the *Brother Jonathan* is a shipwreck upon which salvage operations are being conducted, and there is a reasonable likelihood that the salvage operation will result in other portions of the shipwreck being brought into the territorial, and thus *in rem*, jurisdiction of the court. *See Moyer v. The Andrea Doria*, 836 F.Supp. 1099, 1104 (D.N.J. 1993).

moved for the issuance of an order appointing DSR custodian of the wreck, and directing DSR to take and keep possession of the wreck, to the extent possible, as exclusive salvor of the vessel until such time as the court determines the manner in which the wreck and its cargo, or the proceeds therefrom, should be distributed. Although DSR's requests are encompassed in a single motion, the court will address this motion as if it were two separate motions.

### 1. *Motion for Issuance of Warrant of Arrest*

■ Pursuant to Supplemental Admiralty and Maritime Claims Rule, C(1), an action *in rem* may be brought against a vessel: (a) to enforce any maritime lien; or (b) whenever a statute of the United States provides for a maritime action *in rem* or a proceeding analogous thereto. Supplemental Admiralty and Maritime Claims Rule, C(1). In actions *in rem*, the party seeking relief must "describe with reasonable particularity the property that is the subject of the action, and state that it is within the district or will be during the pendency of the action." Supplemental Admiralty and Maritime Claims Rule, C(2). If, after reviewing the plaintiff's verified complaint and any supporting papers filed therewith, the court finds that "the conditions for an action in rem appear to exist," the court may issue an order so stating and authorizing the Clerk of the Court to issue a warrant for the arrest of the vessel or other property that is the subject of the action. Supplemental Admiralty and Maritime Claims Rule, C(3).[24] If the property is a vessel, or a vessel and tangible property on board the vessel, the warrant is delivered to the United States Marshal for service. *Id.* The United States Marshal may effectuate service by serving the warrant upon artifacts brought into the district and deposited into the custody of the court. Supplemental Admiralty and Maritime Claims Rule, E(3). *See also Columbus–America*, 742 F.Supp. at 1333–34, *rev'd on other grounds*, 974 F.2d 450 (4th Cir.1992).

After carefully reviewing DSR's verified complaint, the briefs and affidavits filed in support of DSR's motion for issuance of a warrant of arrest, and the evidence and arguments presented at the hearings on September 9, 1994 and September 27, 1994, the court finds that the conditions for an action *in rem* appear to exist. DSR has brought this action to enforce a maritime lien in the form of a claim of salvage against the *Brother Jonathan*. (Complaint ¶ 17.) DSR has described with particularity the property that is the subject of this action, and it has sufficiently demonstrated that the *Brother Jonathan* is within the district, or that the court has jurisdiction *in rem* over the vessel. (*Id.* at ¶ 18.) Consequently, the court will grant DSR's motion and issue an order authorizing the Clerk of the Court to issue a warrant for the arrest of the *Brother Jonathan*, her appurtenances, furniture and cargo.

The warrant for arrest shall be delivered to the United States Marshal, and the Marshal will be directed to serve the warrant upon DSR, as custodian of the artifacts already recovered from the *Brother Jonathan*. In addition, pursuant to Supplemental Admiralty and Maritime Claims Rule, C(4), within ten days of the service of the warrant of arrest, DSR will be required to provide notice by publication of the action and arrest in a newspaper of general circulation in the district, as designated in Local Rule 100–5(a),

---

**24.** Supplemental Admiralty and Maritime Claims Rule, C(3) states, in pertinent part:

Judicial Authorization and Process. Except in actions by the United States for forfeitures or federal statutory violations, the verified complaint and any supporting papers shall be reviewed by the court and, if the conditions for an action in rem appear to exist, an order so stating and authorizing a warrant for the arrest of the vessel or other property that is the subject of the action shall issue and be delivered to the clerk who shall prepare the warrant. If the property is a vessel or a vessel and tangible property on board the vessel, the warrant shall be delivered to the marshal for service. If other property, tangible or intangible is the subject of the action, the warrant shall be delivered by the clerk to a person or organization authorized to enforce it, who may be a marshal, a person or organization contracted with by the United States, a person specially appointed by the court for that purpose, or, if the action is brought by the United States, any officer or employee of the United States.
Supplemental Admiralty and Maritime Claims Rule, C(3).

and in the form described by Local Admiralty Rule 605–3(a).

### 2. *Motion for Order Appointing DSR Custodian and Exclusive Salvor of the Brother Jonathan*

 It is common in admiralty cases for the court to appoint a substitute custodian in the place of the United States Marshal to ensure the safekeeping of a vessel that has been placed under arrest. *See* Local Admiralty Rule 610–13(a). It also is common for the first finder of a shipwreck to seek injunctive relief barring competing salvors from interfering with the original finder's right to exclusive possession of, and right to salvage, the vessel. *See Treasure Salvors III*, 640 F.2d at 568–73; *Columbus–America*, 742 F.Supp. at 1330–33, *rev'd on other grounds*, 974 F.2d 450 (4th Cir.1992); *MDM Salvage, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 631 F.Supp. 308 (S.D.Fla.1986). However, "a would-be salvor, upon discovery of a wreck, does not automatically acquire rights to it in perpetuity." *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1061 (1st Cir.1987) (citation omitted). Before the court can grant exclusive salvage rights in a vessel to the first finder, the court must make certain findings regarding the first finder's possession of the vessel and ability to successfully complete salvage operations. *MDM Salvage*, 631 F.Supp. at 310–13.

 If the first finder maintains appropriate possession and control of an identifiable wreck site, he may acquire the exclusive right to conduct salvage operations. *Id.* at 311 (citation omitted). As the Fifth Circuit stated in *Treasure Salvors III*:

A salvor ... has a valuable interest in his salvage operations which the law protects by vesting in the salvor certain rights. Among the most important of these rights are the right to exclude others from participating in the salvage operations, so long as the original salvor appears ready, willing and able to complete the salvage project, and the right to possession of the salved property, a right exclusive even of the owner, until such time as the salvage lien on the property is extinguished or

adequate security for this obligation is given. Although the law of salvage grants the salvor a right to possession of the property, the salvage of a vessel or goods at sea, even when the goods have been abandoned, does not divest the original owner of title or grant ownership rights to the salvor, except in extraordinary cases[.]

640 F.2d at 567.

 To enjoy the continued right to exclusive possession of a shipwreck and protection from interference of rival salvors, a salvor must exercise due diligence and must be capable of actually saving the property from destruction, damage or loss. *MDM Salvage*, 631 F.Supp. at 312. The salvor must intend to reduce the property to physical possession by dealing with the entire wreck site in such a manner as to warn other potential salvors of the claimed area. *Id.* (citation omitted). The salvor, however, may lose his right to uninterrupted salvage operations if he does not assiduously undertake efforts to rescue the property. *Id.* Notorious possession is a prerequisite to the creation and maintenance of a salvor's privilege of exclusive possession. *Id.* (*citing Cobb Coin*, 525 F.Supp. at 204–05). The salvor's possession need not be continuous, however, it must only be as much as the "nature and situation" of the salvage operations permit. *Moyer*, 836 F.Supp. at 1106 (citation omitted). Additionally, the salvor's possession is not defeated when the salvor leaves the wreck for a justifiable reason and with an intention of returning. *Id.* at 1107 (citation omitted).

 A party seeking a preliminary injunction in the Ninth Circuit typically must prove either "(1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Los Angeles Memorial Coliseum Com. v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980). These are not separate tests, but rather "a continuum of equitable discretion whereby the greater the relative hardship to the moving party, the less probability of success must be shown." *Regents of University of California v. American Broadcasting Cos.*,

747 F.2d 511, 515 (9th Cir.1984). To show a likelihood of success on the merits, the moving party need not show with certainty that it will ultimately prevail; however, the "irreducible minimum" required is either a *"fair chance for success on the merits"* or the raising of "questions serious enough to require litigation." *Benda v. Grand Lodge of International Asso. of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir. 1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

Additionally, for a preliminary injunction to issue in a shipwreck case where the court has already issued an initial arrest order, and the preliminary injunction is designed to protect salvage operations, the "salvor's efforts must be (1) undertaken with due diligence, (2) ongoing, and (3) clothed with some prospect of success." *Id.* at 1106 (citation omitted). In cases where the salvor is seeking exclusive salvage rights to a vessel, the court also must examine the extent to which the party seeking injunctive relief has: (1) acted in good faith; (2) "engaged in a sustained and significant commitment to salvage" the vessel; (3) "demonstrated a significant and sustained commitment of capital and resources to its area of arrest;" (4) conducted independent historical research on the vessel; and (5) attempted to preserve the archaeological value of the wreck by marking and photographing the site. *Id.* at 1107; *MDM Salvage,* 631 F.Supp. at 310–11.

In this case, there is no doubt that DSR is entitled to injunctive relief. DSR has acted in good faith. It has demonstrated that it will probably succeed on the merits of its admiralty *in rem* action because it has already located and retrieved artifacts from the *Brother Jonathan.* DSR has further demonstrated that it will suffer irreparable injury if injunctive relief is not granted because DSR will lose its right, as first finder of the *Brother Jonathan,* to retain exclusive possession of the shipwreck and to be free from interference of rival salvors. DSR has constructive possession of the *Brother Jonathan,* insofar as it has unique knowledge of the location of the wreck and it has demonstrated its ability to locate and recover items from the wreck. DSR also has actual possession of the *Brother Jonathan,* insofar as it has recovered several artifacts from the wreck and brought them into the jurisdiction of this court. DSR has expended many years and substantial sums of money to locate the *Brother Jonathan,* and to retrieve the artifacts that have been brought into the jurisdiction of this court. DSR also has conducted independent historical research on the vessel, and it has attempted to preserve the archaeological value of the wreck by photographing the site. Moreover, although the exact location of the *Brother Jonathan* is known only to DSR, with the filing of DSR's motion, it became a matter of public record that the *Brother Jonathan* is located approximately four and one half miles off shore in the vicinity of Crescent City, at a point approximately one and one half miles from Jonathan Rock. Once public notice is given of the execution of the warrant of arrest, it is quite likely that competing salvors will be alerted to the existence of the wreck and attempt to salvage the vessel.

While the court believes that DSR is entitled to a preliminary injunction protecting its continued right to exclusive possession of the *Brother Jonathan,* and protecting it from interference from rival salvors, there is still one obstacle that stands in the way of the issuance of a preliminary injunction: the court is unable to fashion appropriate equitable relief because it does not know the precise location of the *Brother Jonathan.*

In cases where possession, dominion and control over a shipwreck are maintained, the court may issue a preliminary injunction protecting a first finder's exclusive right to possession of the vessel, and prohibiting rival salvors from conducting salvage operations within a reasonable area for a reasonable period of time. *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, "Nuestra Senora de Atocha",* 546 F.Supp. 919, 930 (S.D.Fla.1981). In fashioning such equitable relief, however, "[t]he difficulty lies not so much in recognizing under maritime law, the equities of the situation, but in the fashioning of relief in a manner which does not do violence to freedom of navigation and travel on the high seas and

other basic rights of the world at large to use and travel the high seas." *Id.*

■ What then is a reasonable area? The answer to this question is fact specific. In some cases where the location of the wreck is known, courts have issued injunctions barring competing salvage operations within areas comprising several square miles. *See, e.g., Treasure Salvors,* 546 F.Supp. at 930–31 (13.3 square miles); *Cobb Coin,* 525 F.Supp. at 220. In another case, however, the district court issued a preliminary injunction barring competing salvage operations only on a certain portion of a wreck. *See Moyer,* 836 F.Supp. at 1108.

In the present case, DSR has requested that the court declare a "safety zone in a circle with a radius of 5200 feet with the wreck as the centerpoint around the salvage site[.]" (Complaint ¶ 21.) Given the wreck's proximity to shore, and the fact that the *Brother Jonathan* remains largely intact, DSR's request appears reasonable. After considering the applicable case law, the court finds that a preliminary injunction prohibiting competing salvage operations from occurring within a one mile radius of the *Brother Jonathan* will not "do violence to freedom of navigation and travel on the high seas." The court will issue a preliminary injunction incorporating DSR's request as soon as DSR divulges the precise location of the *Brother Jonathan* to the court.[25]

■ DSR also has requested that it be given priority salvage status, and sole and exclusive possession of the *Brother Jonathan,* for a period of at least five years. (Complaint ¶ 21.) This request is less reasonable. *See Treasure Salvors,* 546 F.Supp. at 930. Although DSR has demonstrated a present ability to salvage the *Brother Jonathan,* it has not offered any reasoning to support its request for a five year injunction, other than its assertion that salvage efforts are expected to take that long. Moreover, although DSR has exercised due diligence to date, there is no guarantee that DSR will

continue to diligently engage in a sustained and significant commitment to salvage the *Brother Jonathan* if it is given five years to complete the task. Under the circumstances, an injunction covering a period of 18 months seems more reasonable. At least 90 days, but no more than 120 days, before the expiration of the initial time period, DSR may apply to the court to extend the preliminary injunction from year to year until salvage operations are completed. *Id.* at 930–31. DSR's application should include a detailed description of its salvage efforts to date, including a description of the number of days or man-hours expended during salvage operations, the extent to which DSR has preserved the archaeological value of the wreck, and an outline of DSR's future plans for salvaging the wreck.

While the court will not issue a preliminary injunction unless and until DSR submits to the court the exact location of the *Brother Jonathan,* the court will issue an order appointing DSR as substitute custodian of the *Brother Jonathan* in the place of the United States Marshal, and DSR will be charged with ensuring the safekeeping of the vessel and any artifacts recovered therefrom, until further order of this court. *See* Local Admiralty Rule 610–13(a).

### III. CONCLUSION

Based on the evidence of record, and for the reasons set forth above, the court finds that the State has failed to demonstrate the existence of a "colorable claim" to the *Brother Jonathan.* The State has failed to demonstrate that the *Brother Jonathan* is "abandoned" and "embedded" as defined by the ASA, or that the Secretary of the Interior has made a written determination that the *Brother Jonathan* is eligible for listing in the National Register. The court also finds that § 6313 of the California Public Resources Code is preempted by 43 U.S.C. § 2106(b). Therefore, the State has failed to demonstrate the existence of a "colorable claim" to

---

**25.** DSR is understandably reluctant to divulge the precise location of the *Brother Jonathan* in either open court or in documents that are not filed under seal. The court understands this reluctance; therefore, DSR may divulge the loca-

tion of the wreck in a document filed under seal. In the alternative, DSR may propose a set of geographic coordinates which will comprise a reasonable area which will be the subject of the preliminary injunction.

the *Brother Jonathan* under California law. Consequently, the State's motion to dismiss DSR's admiralty *in rem* action will be denied.

The court also finds that DSR has sufficiently demonstrated that the conditions for an action *in rem* appear to exist. Therefore, DSR's motion for issuance of a warrant for arrest of the *Brother Jonathan* pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3) will be granted. DSR also will be appointed substitute custodian of the *Brother Jonathan* in the place of the United States Marshal, and DSR will be charged with ensuring the safekeeping of the vessel and any artifacts recovered therefrom, until further order of this court.

Finally, the court finds that DSR, as the first finder of the wreck of the *Brother Jonathan*, is entitled to injunctive relief in the form of an order directing DSR to take and keep possession of the wreck, to the extent possible, as exclusive salvor of the vessel until such time as the court determines the manner in which the wreck and its cargo, or the proceeds therefrom, should be distributed. The court, however, will not issue such an order unless DSR divulges the precise location of the *Brother Jonathan* to the court within 15 days of the date of the order granting DSR's motion for issuance of a warrant of arrest.

Appropriate orders will be entered.

### ORDER

AND NOW, TO WIT, this 15th day of March, 1995, upon consideration of the motion of intervening defendant, the State of California, State Lands Commission ("State"), to dismiss plaintiff Deep Sea Research, Inc.'s admiralty *in rem* action against defendant, the wreck of the *Brother Jonathan*, her appurtenances, furniture and cargo, for lack of subject matter jurisdiction; the briefs and affidavits filed in support of, and in opposition to, the State's motion; and after two hearings before this court, on September 9, 1994 and September 27, 1994; IT IS ORDERED that the State's motion is *denied.*

### ORDER

AND NOW, TO WIT, this 15th day of March, 1995, upon consideration of plaintiff Deep Sea Research, Inc.'s ("DSR") motion for issuance of a warrant of arrest of the defendant, the wreck of the *Brother Jonathan*, her appurtenances, furniture and cargo (collectively *"Brother Jonathan"*), pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3), and for a court order appointing DSR exclusive salvor of the vessel; DSR's brief and affidavits filed in support of this motion; and DSR's verified complaint; the court finds that DSR has sufficiently demonstrated that the conditions for an action *in rem* appear to exist. Therefore, IT IS ORDERED that DSR's motion for issuance of a warrant of arrest of the *Brother Jonathan* is *granted.*

IT IS FURTHER ORDERED that:

(1) pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3), the Clerk of the Court is directed to issue a warrant for the arrest of the *Brother Jonathan*, her appurtenances, furniture and cargo;

(2) the Clerk of the Court shall promptly deliver the warrant for arrest to the United States Marshal, who shall execute the same by serving it upon plaintiff Deep Sea Research, Inc.;

(3) the court hereby appoints Deep Sea Research, Inc. as substitute custodian of the *Brother Jonathan* in the place of the United States Marshal. DSR shall ensure the safekeeping of the vessel and any artifacts recovered therefrom, until further Order of this court; and

(4) pursuant to Supplemental Admiralty and Maritime Claims Rule, C(3), DSR shall, within thirty (30) days of the date of this Order, cause public notice of this action and arrest to be given in a newspaper of general circulation in this district.

The court does not at this time make any Order as to salvor's fees, or title to or distribution of any artifacts recovered from the wreck. The court will reserve judgment on these matters until further notice.

JM

## ORDER

AND NOW, TO WIT, this 5th day of April, 1995, upon consideration of plaintiff Deep Sea Research, Inc.'s ("DSR") motion for a preliminary injunction appointing DSR exclusive salvor of the wreck of the *Brother Jonathan,* her appurtenances, furniture and cargo (collectively *"Brother Jonathan "*), protecting DSR's continued right to exclusive possession of the *Brother Jonathan,* and protecting DSR from interference from rival salvors, and pursuant to the court's Memorandum dated March 15, 1995, IT IS ORDERED that said motion is *granted.*

IT IS FURTHER ORDERED as follows:

1. In accordance with the court's March 15, 1995 Memorandum, DSR is hereby given priority salvage status, and sole and exclusive possession of the *Brother Jonathan;*

2. All competing salvors, would-be salvors, or divers, are hereby enjoined from interfering with DSR's efforts to recover artifacts from the *Brother Jonathan;*

3. All competing salvors, would-be salvors, or divers, are hereby enjoined from conducting salvage operations or collecting artifacts within an area described as a circle having a radius of 5,200 feet (*i.e.,* a diameter of 10,400 feet), having its center point at the geographic coordinates 41 degrees, 46.29 minutes North, and 124 degrees, 20.50 minutes West;

4. This preliminary injunction shall remain in effect for a period of eighteen (18) months from the date of this Order;

5. At least 90 days, but no more than 120 days, before the expiration of the eighteen (18) month time period, DSR may apply to the court to extend the preliminary injunction from year to year until salvage operations are completed. DSR's application shall include a detailed description of its salvage efforts to date, including a description of the number of days or man-hours expended during salvage operations, the extent to which DSR has preserved the archaeological value of the wreck, and an outline of DSR's future plans for salvaging the *Brother Jonathan.*