**MDM SALVAGE, INC., Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL,**
etc., Defendant,

v.

**ELIZABETH MASSEY INVESTMENT CORP., Intervening Plaintiff,**

v.

**Robert JORDAN, Intervening Plaintiff.**

**ELIZABETH MASSEY INVESTMENT CORP., Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED, AND ABANDONED SAILING VESSEL,**
etc., Defendant,

v.

**MDM SALVAGE, INC., Intervening Plaintiff,**

v.

**Robert JORDAN, Intervening Plaintiff.**

**Nos. 84–2256–Civ., 85–2702–Civ.**

United States District Court,
S.D. Florida,
Key West Division.

March 24, 1986.

Martin Lindahl, Coral Gables, Fla., for MDM Salvage, Inc.

Rick G. Bannon, Key West, Fla., for Elizabeth Massey Inv. Corp.

Gerhardt A. Schreiber, Coral Gables, Fla., for Robert Jordan.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

Rival salvors, perhaps more accurately described as modern day treasure hunters, are herein litigating their respective rights to salvage what they believe to be one or more Spanish ship wrecks dating from the 1730s in an area known as "Coffins Patch," lying seaward of Marathon, Florida.

### BACKGROUND

MDM Salvage, Inc. (MDM), has claimed a triangular shaped area of the ocean, pursuant to a warrant of arrest originally issued in Case No. 84–2256–Civ–ARONOVITZ (and thereafter amended) in which to conduct exclusive salvage operations in search of defendant vessel. Elizabeth Massey Investment Company (EMI) likewise seeks exclusive salvage rights in a rectangular shaped area of the ocean pursuant to a warrant of arrest issued in Case No. 85–2702–Civ–ARONOVITZ. These two claims, however, overlap significantly, and as to this area, MDM seeks exclusive salvage rights as against all prospective salvors, including EMI. EMI, for its part, seeks to have this Court create a common area in the overlap wherein both parties can salvage, each maintaining an appropriate distance from the other. EMI also seeks exclusive salvage rights as to another sector of the overlap area. Both MDM and EMI are additionally seeking possession, confirmation of title, or alternatively, a liberal salvage award as to recoveries made in their respective areas.

Both MDM's and EMI's claims have been consolidated for trial, after having previously been consolidated for an Emergency Hearing held in this Cause on August 14, 1985 in West Palm Beach, Florida. At that time, this Court, *inter alia,* stayed all salvaging operations within the respective overlap areas for a thirty day period. Recently, Robert Jordan, a longtime treasure hunter, intervened in both actions. Said

intervenor now claims only that neither MDM nor EMI should be granted exclusive salvage rights in any of the respective areas. This Court has conducted a non-jury trial in this matter and has carefully considered the witnesses' testimony, all exhibits, the arguments of counsel, and being otherwise fully advised in the premises, thereupon enters its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The parties herein have not clearly ascertained whether one or two Spanish wrecks lie in the disputed area, although EMI has repeatedly asserted the existence of two wrecks, while MDM has generally referred to only one wreck. What is clear, however, is that the purported existence in the Coffins Patch area of one or more wrecks from the 1733 Spanish Fleet, perhaps the San Fernando or the San Ignacio, has been common knowledge for at least a quarter of a century. See Meylach, Diving to a Flash of Gold (Excerpts at Plaintiff Jordan's Exhibits 2 and 6). The cited text describes the destruction of the 1733 Spanish Fleet as follows: "The ships closest to the eye of the hurricane suffered a tremendous battering. One ship, believed to be either the San Fernando or the San Ignacio, was driven across a mile-wide shoal later to be known as 'Coffins Patch.' She burst open at first impact, dropping many of her cannon and anchors.... For each yard she moved the ship gave of herself in bits and pieces. Her innards were scattered in a glittering trail a hundred yards wide. She dropped ballast, rock, coins, cannon, and people as she was mauled along. No power could have wrought more total dismemberment." Id. at 25.

Likewise, Captain Jack Steffany, who has cooperated with MDM, testified that he salvaged in the Coffins Patch area along with Mel Fisher of Nuestra Senora de Atocha fame in the early 1960s. And, over the years, a number of other commercial salvors and recreational divers, including intervening Plaintiff Jordan, have engaged in varying degrees of salvage at Coffins Patch.

No party in this action has engaged in independent historical research as to the respective wreck or wrecks, relying instead on various magazine articles and respected books such as Diving to a Flash of Gold, supra. Nor has any party made a real effort to preserve the archaeological integrity of the purported wreck site, with EMI's consulting archaeologist, who testified in court, having agreed to perform a research design for EMI the day before he testified. Archaeological preservation, on-site photography, and the marking of sites are particularly important in the instant context, as the public interest is compelling in circumstances in which a treasure ship, constituting a window in time provides a unique opportunity to create a historical record of an earlier era. These factors constitute a significant element of entitlement to be considered when exclusive salvage rights are sought. This is not to say that the parties have failed to act in good faith. Indeed, they have so acted and this Court is entirely confident that they will continue to act in the best traditions of maritime salvage in the future. Still, no party in this action has located significant artifacts establishing the existence of an ancient wreck or wrecks in the confines of the areas claimed.

First, Intervening Plaintiff Robert Jordan does not now claim exclusive salvage rights as to any area, as he has only conducted sporadic salvage operations in Coffins Patch over the last two decades. Rather, Jordan seeks to deny exclusive salvage rights to both MDM and EMI, while permitting these and other salvors to continue working in the Coffins Patch area.

Second, EMI has engaged in at least some degree of sustained salvaging activities, as compared to Intervening Plaintiff Jordan. The logs of EMI's sole salvor on site, Stefan Sykora, reveal 29 days of salvage activities in 1985. Sykora testified, however, that he engaged in more salvaging than that which is indicated in his logs insofar as he only recorded his work on a

particular day when he made a successful find. The evidence as to the extent of Sykora's salvage activities, however, has been largely inconsistent and undocumented. Sykora engaged in some salvage activity in October of 1984, returned in July of 1985, and made the bulk of his artifact recoveries in October and November of 1985, after the expiration of the 30 day stay of salvaging operations which this Court imposed in August of 1985. MDM has asserted that the Parties agreed to honor the thirty day stay after its expiration—No such agreement has been proven, however, and the stay was not extended until November 20, 1985. Sykora also conducted some salvage operations in the pertinent area in 1983, pursuant to a prior warrant of arrest which was later dismissed for lack of prosecution.[1] Robert Riley, Jr. testified as to EMI's budget and property, but failed to adequately demonstrate that EMI has made a significant committment of capital and resources to its area of arrest.

Finally, MDM, for its part, has also engaged in some degree of sustained and good faith salvage activity. Although the figures presented to the Court have been inconsistent, MDM seems to have salvaged for 29 days in 1984 and for 45 days in 1985 using a 34 foot vessel, the "Lisa T" as well as a 17 foot runabout. The Captain of the "Lisa T," resigned from MDM in September of 1985, and at this time, MDM's sole active salvor is Michael Leonard. MDM, like EMI, has not demonstrated a significant and sustained commitment of capital and resources to its area of arrest.

What MDM and EMI have done, however, is to prepare extensive charts and diagrams mapping the coordinates of their finds and thereby presenting scatter patterns of the purported wreck or wrecks. These diagrams have been of assistance to the Court, but they do not in and of themselves demonstrate that any party has, at this time, engaged in a sustained and sig-

nificant commitment to salvage the purported wreck sites.

## CONCLUSIONS OF LAW

This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333. Claims arising out of salvage operations at sea beyond the territorial limits of the United States are within the admiralty jurisdiction of the federal courts. *Treasure Salvors Inc., v. The Unidentified, Wrecked, and Abandoned Sailing Vessel,* 640 F.2d 560 (5th Cir.1981) (Treasure Salvors III). The respective claim areas of both MDM and EMI extend into Florida waters. Although this Court's jurisdiction is not impeded as to recoveries in state waters, any final judgment which may eventually be entered as to these areas must specifically exclude a determination as to the State of Florida's ownership of any artifacts recovered in state waters. *State of Florida v. Treasure Salvors, Inc.,* 689 F.2d 1254 (5th Cir.1982). At such future time, the parties and/or others will have the responsibility of complying with the pertinent Florida law.

■■■ The law of finds, a common law doctrine, dictates that the finder of abandoned property must continuously possess or be in the process of reducing to possession the property which he has found. With regard to the requirement of continuous possession, the law of finds is unforgiving. *Hener v. United States,* 525 F.Supp. 350, 354 (S.D.N.Y.1981), citing *Eads v. Brazelton,* 22 Ark. 499 (1861). If a first finder maintains appropriate possession and control of an identifiable abandoned wreck site, he may acquire the exclusive right to continue recoveries. *Treasure Salvors, Inc. v. The Unidentified, Wrecked, and Abandoned Sailing Vessel,* 556 F.Supp. 1319 (S.D.Fla.1983). Thus, in a first finder situation, the law of finds and salvage merge to give the first finder/sal-

---

1. EMI has interposed a counterclaim as to the prior warrant of arrest in Case No. 83–122–Civ–HOEVELER. Said case, however, as noted, was dismissed for lack of prosecution. This Coun- terclaim was not individually addressed at trial, and the Court will deem said counterclaim to be merged with EMI's main cause of action.

vor sole possession of the property. *Treasure Salvors III, supra,* 640 F.2d at 567.

No salvor who now claims superior salvage rights as to the wreck or wrecks in Coffins Patch claims to be a first finder. As noted, for at least twenty-five years, many salvors have recovered evidence of a wrecked Spanish vessel in Coffins Patch. Distinguished from the law of finds, the law of salvage primarily is concerned, not with title, but with successful recovery and possession of lost property from the oceans and waterways. Salvage contemplates the right to possess property for the purpose of saving it from destruction, damage or loss, and to retain it until proper compensation has been paid. A salvage claim requires proof of three essential elements: (1) a marine peril; (2) service voluntarily rendered and not required as a pre-existing duty; (3) success, wholly or partly, in recovering the imperiled property. *Treasure Salvors, Inc. v. The Unidentified, Wrecked, and Abandoned Sailing Vessel,* 546 F.Supp. 919, 927 (S.D.Fla.1981).

In the case at bar, MDM and EMI seek not only a salvage award (which they are entitled to, *see infra*), but also exclusive rights to salvage in their respective areas. To be sure, if a wreck site and recoveries are brought within the jurisdiction of a Federal Court, the salvor's exclusive right to possess can be protected by enjoining subsequent rival salvors from interfering with the current salvor's efforts. *Treasure Salvors III, supra,* 640 F.2d at 571. To enjoy the continued right to exclusive possession and protection from interference of rival salvors, a salvor must exercise due diligence and must be capable of actually saving the property. The salvor must intend to reduce the property to physical possession by dealing with the entire wreck site in such a manner as to warn other potential salvors of the claimed area. *Cobb Coin v. Unidentified, Wrecked, and Abandoned Sailing Vessel,* 525 F.Supp. 186, 204 (S.D.Fla.1981). One who discovers but does not assiduously undertake to rescue abandoned property may lose his right to uninterrupted salvage operations. Noto-

rious possession is a prerequisite to the creation and maintenance of a salvor's privilege. *Cobb Coin, supra,* 525 F.Supp. at 204–5.

Despite the good faith and the commendable efforts of the salvors before this Court, their salvage activities, thus far, are not of the scope warranting injunctive relief granting exclusive salvage rights of any kind. Neither party has salvaged the wreck or wrecks in question to such an extent that one or the other should have exclusive rights vis-a-vis themselves or others. Although there have heretofore been warrants of arrest and injunctive relief in this area, it behooves this Court to pause and recognize the magnitude of the injunctive relief requested herein. The parties are asking this Court to provide them with exclusive salvage rights to various areas of the ocean to search for a vessel or vessels, the possible existence of which in said area, has been common knowledge for twenty-five years. The parties, as noted, have not been actively salvaging the wreck sites for a sufficient number of days, they have not invested sufficient capital in their respective projects, and they have not sought to preserve the archaeological integrity of the area. Nor have the parties exercised dominion or control over the areas claimed. For that matter, no party has established that a wreck has in fact been discovered with any significant containment of recoverable artifacts.

Under the facts and circumstances of this case, the litigants' requests for exclusive salvage rights of any kind, in the overlap area or otherwise, is simply premature. This Court is particularly concerned that these parties are suggesting that they be granted exclusive salvage rights to a shallow water ocean wreck site, in an area as to which no convincing evidence of the near-term ability to salvage the wreck or wrecks in question has been demonstrated. Under the equities of this case, the Court cannot and should not fashion injunctive relief which would necessarily unduly infringe on freedom of navigation and travel

on the high seas, as well as the rights of other salvors to work the respective areas.

In this and other contexts, courts have recognized the limits which must be placed on the rights of a salvor to obtain exclusive salvage rights. For instance, in *Cobb Coin, supra,* the Court, in considering the salvage rights of one litigant, stated: "While salvage law will permit one whose salvage efforts are continuous and reasonably diligent to work a wrecksite, once discovered, to the exclusion of others.... until discovery and subsequent dominion of the site occurs, no one may be restricted from exploring the navigable waters for salvageable sites." 525 F.Supp. at 203. The Court thereupon found the subject salvor's "possession and salvage operations ... insufficient to give it the type of right to exclude competing salvors required by federal maritime law." *Id.* at 204. *See also Brady v. S.S. African Queen,* 179 F.Supp. 321 (E.D.Va.1960); *Eads v. Brazelton,* 22 Ark. 499 (1861).

For the foregoing reasons, the claim of any party herein to exclusive salvage rights in any area must be rejected, injunctive relief denied, and the heretofore existing warrants of arrest quashed. This Court is not holding that either MDM or EMI shall not be entitled to renew their applications for warrants of arrest and/or injunctive areas after they have engaged in more sustained salvage activity. Rather, the instant suits are simply premature, and future activity may very well warrant renewal of the pertinent requests for judicial relief.

*Salvage Award*

█ Separate and apart from the question of exclusive salvage rights, MDM and EMI have indeed salvaged various artifacts from their respective areas, as evidenced by the reports submitted to this Court, and they are entitled to a liberal salvage award. It has been stated in this Circuit, under circumstances analogous to the case at bar, that salvage operations like this, satisfy the requisite elements for a salvage award. *See, e.g., Cobb Coin v. The Unidentified Wreck, etc.,* 549 F.Supp. 540, 557 (S.D.Fla. 1982). And, under the rather unusual circumstance of the salvage of ancient wrecks, the salvage award herein "should differ from traditional awards. It should be given in specie because the property saved is uniquely and intrinsically valuable beyond any monetary value." *Id.* at 561. This Court therefore awards both MDM and EMI all artifacts heretofore recovered by said parties in their respective salvage areas for salvage services rendered. This award does not include those artifacts, if any, recovered in Florida state waters. *See supra* for discussion of rights of State of Florida.[2]

It is thereupon ORDERED AND ADJUDGED as follows:

1. The heretofore existing warrants of arrest in Case No. 84–2256–Civ–ARONOVITZ and Case No. 85–2702–Civ–ARONOVITZ, are hereby QUASHED and further warrants at this time are, hereby, DENIED, without prejudice.

2. The stay of salvage operations which has been in effect since November 20, 1985, is hereby DISSOLVED.

3. Each and every request for injunctive relief in the form of exclusive salvage rights in the overlap area and otherwise is hereby, DENIED, without prejudice to renew when and if appropriate.

4. MDM and EMI shall receive salvage awards, in specie, for salvage services rendered, as set forth above.

**2.** The salvage awards herein are subject to and conditioned upon the following:

 a. MDM and EMI, before removing any articles from Court custody, shall file with the District Director of Customs, Miami, Florida, an Entry Summary (Customs Form 7501) and a Pro-Forma Invoice in substantially the same form as described in 19 C.F.R. § 141.85 for all the articles and a Continuous Customs Bond (Customs Form 301) written by a Surety authorized to write customs bonds, in an amount set by law, if required by U.S. Customs.

 b. MDM and EMI shall comply with all customs laws and regulations concerning the entry of merchandise for any future importations of articles when recovered but which have not yet been raised.

5. Both MDM and EMI (as well as other salvors) shall hereafter be permitted to salvage in the areas previously subject to the warrants of arrest which have now been quashed, but no salvor shall anchor within 100 yards of the site where any other salvor has anchored a vessel so as to salvage adjacent areas. The parties are to exercise prudence and civility in working the area.

6. All parties shall bear their own costs and attorney's fees. If there are any costs due and owing to the United States Marshal for custodial services or otherwise, said costs shall be paid by the party who has incurred them.