**R.M.S. TITANIC, INC., successor in interest to Titanic Ventures, limited partnership, Plaintiff,**

**v.**

**The WRECKED AND ABANDONED VESSEL, its engines, tackle, apparel, appurtenances, cargo, etc., Located within one (1) nautical mile of a point located at 41° 43′ 32″ North Latitude and 49° 56′ 49″ West Longitude, believed to be The RMS Titanic, in rem, Defendant.**

Civil Action No. 2:93cv902.

United States District Court,
E.D. Virginia,
Norfolk Division.

May 10, 1996.

F. Bradford Stillman, Mark S. Davis, David M. Young, McGuire, Woods, Battle & Boothe, Norfolk, VA, for Plaintiffs, R.M.S. TITANIC, INC., etc.

Jonathan M. Epstein, James T. Shirley, Jr., Haight, Gardner, Poor & Havens, Washington, DC, Lawrence G. Cohen, Anne B. Shumadine, Mezzullo & McCandlish, Norfolk, VA, for John A. Joslyn, Movant.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

At issue before the Court is a challenge to its Order of June 7, 1994, granting salvor-in-possession status to R.M.S. Titanic, Inc. For the reasons stated from the bench and elaborated on more fully below, the Court's ruling from the bench being made a part hereof, the Court DENIES Joslyn's Motion requesting a rescission of the June 7, 1994 Order.

### I. PROCEDURAL HISTORY

On August 23, 1993, RMS Titanic, Inc. (RMST) filed a verified complaint asking the Court to declare it to be the sole and exclusive owner of any items salvaged from the RMS TITANIC (TITANIC).[1] As required

---

1. A previous action was filed in this Court on August 7, 1992 by Marex Titanic, Inc., a salvor wholly unrelated to RMST. RMST's predecessor in interest, Titanic Ventures, L.P., filed a motion to vacate arrest and dismiss the complaint and a verified motion for preliminary injunction. On October 13, 1992, the Court entered an order finding Titanic Ventures to be the salvor in possession of the wreck site; this judgment was subsequently reversed by the Fourth Circuit on other grounds. *Marex Titanic, Inc. v. The Wrecked and Abandoned Vessel, RMS TITANIC,* 805 F.Supp. 375 (E.D.Va.1992), *rev'd on other grounds,* 2 F.3d 544 (4th Cir.1993). Because the dismissal of the action also dismissed the portion of the order granting Titanic Ventures salvor-in-possession status, RMST, as successor in interest,

by the Court, notice to other potential salvors and interested parties was given via publication. Liverpool and London Steamship Protection and Indemnity Association (LLSP) was the only party to file a claim. RMST and LLSP subsequently entered into a settlement agreement, and the Court dismissed LLSP's claim with prejudice. Because there were no other outstanding claims against the vessel, the Court entered an Order on June 7, 1994, conferring salvor-in-possession status of the TITANIC to RMST and granting it the exclusive rights over any items salvaged from the TITANIC while it remained salvor in possession.[2]

Following the entry of this Order, RMST successfully completed a salvage expedition to the TITANIC during the 1994 "weather window."[3] On August 10, 1994, RMST presented its *Periodic Report of Salvor in Possession on the Progress of Recovery Operations* to the Court. The Court entered an Order filing the Periodic Report, and also noted that RMST had previously conducted successful salvage operations in June of 1987 and June of 1993. Order of Aug. 10, 1994. While the present action was pending in this Court, RMST filed a second periodic report.

On February 20, 1996, John A. Joslyn (Joslyn or Intervenor) filed a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure asking the Court to rescind its order naming RMST salvor in possession of the TITANIC. Joslyn claimed that RMST's status should be rescinded because it has failed to diligently salvage the TITANIC, has evidenced no intention to salvage it in the future, and, at this time, is financially incapable of utilizing its rights. In its response, in addition to refuting Joslyn's claims, RMST asserted that Joslyn had no standing to bring his motion. Thus, before the Court could

hear the merits of the claim, the Court was obliged to resolve the issue of the Joslyn's standing. By Order of April 1, 1996, the Court held that Joslyn did have standing and that, even if he did not, the Court had the power to reconsider its prior Order either *sua sponte* under Rule 60(b) of the Federal Rules of Civil Procedure or under its inherent power to modify and interpret its original order. *See* Order of Apr. 1, 1996.

An evidentiary hearing was held from April 29 to May 1, 1996. The Court heard testimony from a number of witnesses concerning both RMST's salvage-related activities since its 1994 expedition and RMST's present financial situation. Because the summer "weather window" was approaching and a quick determination of the parties' status was necessary, the Court ruled from the bench after closing arguments. The Court more fully discusses the basis for its ruling below.

## II. FINDINGS OF FACT

### A. RMS Titanic, Inc.

RMST, the present salvor in possession of the RMS TITANIC is incorporated in Florida and is a public corporation with sixteen million outstanding shares. The largest shareholders of RMST include Titanic Ventures Limited Partnership (TVLP) (with approximately 43% of the shares), Mr. Arnold Geller (with approximately 12% of the shares), and Mr. William Gasparrini (with approximately 12% of the shares). TVLP, the largest shareholder, is a Connecticut limited partnership with one general partner and fifteen limited partners. Another corporation, Oceanic Research and Exploration

refiled a claim for exclusive salvage rights in 1993.

**2.** The Court's Order provided that:
RMS Titanic, Inc. is the salvor in possession of the wreck and wreck site of the RMS TITANIC, including without limitation, the hull, machinery, engine, tackle, apparel, appurtenances, contents and cargo, and that RMS Titanic, Inc. is the true, sole and exclusive owner of any items salvaged from the wreck of the defendant vessel in the past and, so long as RMS Titanic, Inc. remains salvor in possession,

items salvaged in the future, and is entitled to all salvage rights, and that default judgement is entered against all potential claimants who have not yet filed claims and such claims are therefore barred and precluded so long as RMS Titanic, Inc. remains salvor in possession. . . .
Order of June 7, 1994.

**3.** Because of weather conditions at the site, salvage operations are only feasible during the months of June, July, and August.

(ORE), a Delaware corporation, is the general partner of TVLP.[4]

Mr. George Tulloch, the current president of RMST, testified that since its inception, RMST has lost $9.8 million.[5] RMST also has a number of outstanding liens and encumbrances against certain TITANIC artifacts. A Virginia law firm has a lien against two artifacts located in Virginia for legal services rendered. These two artifacts are to be exhibited in the Tidewater, Virginia area until the attorneys' fees are paid. RMST also has an agreement with Electricité de France (EDF), the conservator of the 1987 artifacts, which gives EDF the right to exhibit fifteen TITANIC artifacts for ten years in lieu of collecting $70,000.00 which RMST still owes EDF for its conservation work.

In addition to the attorneys' fees owed for litigation over salvage rights, RMST has also been a party in at least two other actions. Although one of these lawsuits has been dropped, RMST's potential liability in the other is unclear.

Additionally, RMST has a number of outstanding debts. It still owes money to LP3, a conservation laboratory in France, for past conservation efforts. Moreover, Mr. Stéphane Pennec, the director of LP3, testified that to merely store and preserve the artifacts currently at LP3 will cost RMST an additional $23,000.00. RMST also has a few "friendly" debts, which their creditors are not collecting at the moment. In fact, Mr. Tulloch's testimony, which was uncontradicted, indicated that these creditors may prefer to be official sponsors of RMST-run TITANIC events in lieu of being repaid.

Despite its debt load, RMST remains a financially viable entity. Although RMST appears to have little cash on hand, RMST presented evidence that it has a number of exhibition contracts signed or pending. A few companies have also signed contracts with RMST to obtain advertising rights. A contract for the production of a two-hour documentary is also pending. RMST, through its marketing partner, has been making money through the sale of videos and coal. *See* discussion *infra* part II.B. Finally and most significantly, RMST's marketing partner has organized two cruises to the wreck site in order to generate income to finance the 1996 salvage operations.[6] Ticket prices range from $1,800 to $6,950. As of the date of the hearing, 60% of the cabins had been booked on one ship and 10% had been booked on the other.[7] Michael R. Giorgio, the marketing company's chief financial officer, testified that RMST would net $2.4 million dollars from the cruises. He also testified that if the receipts for the cruise sales are insufficient to cover IFREMER's[8] charges, the marketing company would cover the costs. Furthermore, RMST has been attempting to pay some of its debts. IFREMER, one of RMST's major creditors, was recently paid the money owed it from the 1994 expedition.

The Court was not surprised that RMST was suffering some financial difficulties. This type of salvage operation is highly speculative and the expedition costs are high. Because RMST does not sell the artifacts it recovers, it is even more difficult to raise

---

4. In March of 1996, Joslyn and another individual brought suit in Delaware concerning the ownership and control of ORE. In early April, because a previous litigation involving the corporate structure of ORE had occurred in Connecticut in 1992, the Delaware action was stayed pending a possible determination of the parties' rights in Connecticut. The Delaware court felt that Connecticut was the best forum to litigate issues relating to this prior action. At the evidentiary hearing on this matter, this Court declined to make any decisions about ORE's current corporate struggles, leaving those issues to the Connecticut court.

5. The November 1995 10Q form submitted to the Securities and Exchange Commission stated that at present, RMST has $2.1 million in liabilities and $160,000 in assets.

6. IFREMER has agreed to supply vessels, equipment, and salvage personnel for the 1996 expedition provided that RMST pays it approximately $840,000.00 before the expedition.

7. One reason for the difference in the cabin sales is that tickets for the Boston trip went on sale a few weeks before the tickets for the New York trip.

8. IFREMER is the French government's oceanographic institute which has provided the salvage vessels, equipment, and technicians on past expeditions.

money to support its salvage and conservation activities.

## B. RMST's Salvage–Related Activities

RMST and its predecessor in interest, Titanic Ventures, L.P., have conducted salvage operations at the wreck site of the TITANIC in 1987, 1993, and 1994. To date, over 3,600 artifacts have been recovered from the wreck. Two artifacts, one from the June 1993 expedition and one from the July 1994 expedition, remain within the geographic boundaries of the Eastern District of Virginia.

Since the 1994 expedition, RMST has not visited the site of the wreck. RMST has, however, been involved in a number of on-shore activities since that time. From October 1994 to October 1995, over 150 artifacts were exhibited at the National Maritime Museum of Great Britain located in Greenwich, England. This museum is the largest museum of its kind in the world. The exhibition was originally scheduled to be held for six months, but, because of the large turnout,[9] it was extended for another six months. Catalogs detailing the TITANIC wreck and salvage activities were produced and sold at the exhibition. There have also been several smaller exhibitions during the past few years, including one currently at the Science and Industry Center in Paris, France.

In addition, during 1994, an International Advisory Committee was established to address issues related to the future of both the wreck site and the retrieved artifacts. This committee consists of approximately twelve individuals, including representatives of European and American maritime museums, TITANIC historical societies, and RMST. One of the committee's major tasks is to plan an international memorial museum which will house all the artifacts retrieved from the site.

Although RMST has promised not to sell any of the artifacts recovered from the site,[10] the company recently began selling the coal retrieved from the vessel to the public.[11] RMST, as well as other interested parties including the National Maritime Museum of Great Britain, do not consider the coal lumps to be "artifacts," as the coal is natural and not man-made. Because of the practical and monetary needs in funding expeditions to a historical site such as this, "natural" objects have been deemed expendable and saleable. Thus far, over $250,000 has been collected in coal sales.

Furthermore, since the last expedition, RMST has been committed to its role as "caretaker" of the retrieved artifacts. RMST has hired LP3 to actively conserve selected artifacts as well as to safely store and preserve the remainder until sufficient funding is available to actively work on those items.[12] Mr. Pennec, director of LP3, is a trained conservationist and is the supervisor of the recovered TITANIC artifacts. The evidence demonstrated that Mr. Pennec is a highly skilled and reputable conservator, and that the salvaged artifacts are being properly conserved and carefully preserved by LP3.[13] Thus, RMST has kept its promise to maintain and preserve the TITANIC artifacts.

## C. Future Plans

RMST has planned an expedition for August of 1996. In addition to its regular sal-

9. During the TITANIC exhibition, over 720,000 people visited the museum, the largest attendance in its history.

10. As part of an agreement with the French government, RMST has promised not to sell artifacts. In addition, this position has been included as a part of the policy statement agreed to with the National Maritime Museum of Great Britain. Furthermore, RMST's promise to keep the artifacts together was one of the factors this Court considered when it granted salvor-in-possession status to RMST in 1994.

11. The coal is sold in small pieces and comes in a display case with an accompanying plaque.

12. At the present time, the complete conservation of the artifacts retrieved during the 1993 expedition is nearly finished, and the 1994 artifacts have been safely stored until funds become available.

13. The Court makes this finding both from its own observations of Mr. Pennec and the testimony of Dr. Stephen Deuchar of the National Maritime Museum of Great Britain. While visiting LP3, he and Mr. Grayson, the museum's head conservator, were satisfied with the conservation activities of the lab.

vage operations, RMST, in conjunction with IFREMER, is planning to raise a small piece of the hull which is presently lying on the seabed, detached from the vessel.[14] The raising of this hull fragment coincides with the planned arrival of two cruise ships at the wreck location. Not only will these cruises generate income to finance the 1996 salvage expedition, they will also provide interested individuals a chance to visit the site and witness the salvage operations.[15] In addition, RMST is finalizing an agreement to permit the production of a two-hour documentary detailing this event, as well as the other salvage operations. This year's salvage operations will also utilize new technology to illuminate the site, which should give scientists and historians an increased visual understanding of the wreck site.

RMST is arranging an exhibition of the recovered hull fragment in Boston and New York upon the arrival of the two cruise ships to their home ports. The fragment will then be displayed at a New York exhibition along with retrieved artifacts from the 1996 expedition which do not require intensive conservation work. RMST is also in the process of organizing other expositions of TITANIC artifacts, including a traveling exhibition in Europe.

## III. CONCLUSIONS OF LAW

### A. Applicable Salvage Law

■ The underlying purpose of salvage law is the complete salvaging of a distressed vessel. See *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450, 460–61 (4th Cir.1992) ("the primary purpose of salvage law is the preservation of property"), cert. denied, 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); *MDM Salvage, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 631 F.Supp. 308, 312 (S.D.Fla.1986) (salvage law is primarily concerned with the successful recovery of the

vessel). As a consequence, courts sitting in admiralty have the authority to grant exclusive salvage rights and salvage awards to salvors who "have the intention and the capacity to save the property." *Columbus–America Discovery Group*, 974 F.2d at 460.

In this case, the Court has already granted salvor-in-possession status to RMST. See Order of June 7, 1994. The current issues before the Court are (1) whether RMST's status as salvor in possession should be rescinded and (2) what standard should be used to make such a determination. Many courts have indicated that a salvor can lose his exclusive possessory rights to the wreck if he fails to "exercise due diligence and be reasonably successful in his attempts." *Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 525 F.Supp. 186, 204 (S.D.Fla.1981); accord *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir.1981) (salvor has right to exclude others "so long as the original salvor appears ready, willing and able to complete the salvage project"); *Deep Sea Research v. BROTHER JONATHAN*, 883 F.Supp. 1343, 1361 (N.D.Cal.1995) (salvor "may lose his right to uninterrupted salvage operations if he does not assiduously undertake efforts to rescue the property"); cf. *Columbus–America Discovery Group*, 974 F.2d at 460 (salvor "must have the intention and the capacity to save the property involved"). At issue in the majority of these cases was the salvor's right to an injunction against rival salvors. Few cases have involved the rescission of salvor-in-possession status after the status has been granted. See *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059 (1st Cir.1987) [hereinafter *MAVIS II*]; cf. *Brady v. S.S. AFRICAN QUEEN*, 179 F.Supp. 321 (E.D.Va.1960) (first finder of abandoned property loses salvage rights to

---

**14.** This section is approximately four meters wide and ten meters long. Pierre Henri Nargeolet, the expert technician who will be supervising the dives, estimated the fragment to weigh between eight and fifteen tons.

**15.** The cruises have been arranged to be floating TITANIC conventions. Plans for the passengers include: lectures by TITANIC historians, TV screens broadcasting footage from the salvage operations, a re-creation of the CALIFORNIA incident, and, of course, an opportunity to witness a portion of the hull-raising.

second finder); *Eads v. Brazelton,* 22 Ark. 499 (1861) (same).

■ In one such case involving the rescission of exclusive salvage rights, the First Circuit stated that a salvor must demonstrate that its efforts are "(1) undertaken with due diligence, (2) ongoing, and (3) clothed with some prospect for success" in order for it to maintain its rights. *MAVIS II,* 833 F.2d at 1061. Because the original salvor did not appeal the district court's finding that it had been dilatory, the circuit court did not apply the standard to the facts and circumstances of the case. *See id.* The test outlined in *MAVIS,* however, was based upon language from two other cases, *Hener v. United States,* 525 F.Supp. 350 (S.D.N.Y. 1981), and *Cobb Coin.* Although neither of these cases involved the rescission of salvor-in-possession rights,[16] both cases furnish additional guidance on the application of this standard.

■ In *Hener,* the district court concluded that because salvage law is primarily concerned with "encourag[ing] open, lawful, and cooperative conduct, all in the cause of preserving property," it provides courts "more flexib[ility] in determining whether a salvor has commenced an operation worthy of protection." 525 F.Supp. at 358. Furthermore, because salvage rights are not necessarily permanent, "admiralty courts have more freedom to protect salvage operations that are *substantial and promising though not yet successful.*" *Id.* (emphasis added). The *Cobb Coin* court highlighted two types of exclusive salvage rights cases—those in which the courts have considered a wreck site to be abandoned where the first finder failed to take any real "possession" of it, thereby enabling a second finder to be awarded salvage rights, 525 F.Supp. at 204–05 (citing *AFRICAN QUEEN,* 179 F.Supp. 321, and *Eads,* 22 Ark. 499), and those courts which have refused to grant salvage rights to the second salvor because the original salvor's departure from the wreck site was "temporary," for a legitimate reason, and with the intention of returning within a rea-

sonable time, *id.* at 205–06 (citing *Rickard v. Pringle,* 293 F.Supp. 981 (E.D.N.Y.1968)). *Hener* and *Cobb Coin* thus demonstrate both the flexible nature of salvor-in-possession rights and the equitable considerations that courts weigh when evaluating the appropriateness of awarding those rights. In addition, these cases illustrate the fact that a salvor in possession does not need to continuously guard the salvage site in order to maintain its rights.

■ Cases granting exclusive salvage rights to one salvor and enjoining its rivals from interfering at the wreck site are also relevant to the present analysis. The standard those cases have employed is the same or is very similar to the standard described in *MAVIS II.* In fact, some recent decisions, in granting original salvor-in-possession rights, have quoted and relied, at least in part, upon the *MAVIS II* standard. *See, e.g., Bemis v. RMS LUSITANIA,* 884 F.Supp. 1042, 1051 (E.D.Va.1995) (a recent decision of this Court); *Moyer v. Wrecked & Abandoned Vessel, Known as the ANDREA DORIA,* 836 F.Supp. 1099, 1106 (D.N.J.1993). In *ANDREA DORIA,* after citing the *MAVIS II* standard, the district court expounded on its application and scope stating that, in order to receive exclusive salvage rights,

> possession need not be continuous, but only as such the 'nature and situation' of the salvage operations permit. At the same time, the possession must be notorious and give warning to actual or potential rival salvors of the ongoing salvage operations. Possession is not defeated, however, when the salvor leaves the wreck for a justifiable reason and with an intention of returning.

836 F.Supp. at 1106–07 (internal citations omitted); *accord BROTHER JONATHAN,* 883 F.Supp. at 1361; *see also LUSITANIA,* 884 F.Supp. at 1051. Hence, these cases also highlight the fact that, although a salvor in possession must demonstrate some degree of control over the wreck site, the "nature and situation" of the operations and the site itself will affect the requisite amount of control

---

**16.** The selection of a salvor in possession was at issue in *Hener.* 525 F.Supp. at 364–65. The *Cobb Coin* court discussed the differences be-

tween Florida's salvage law and federal admiralty law, including their effects on second salvors. 525 F.Supp. at 204–07.

necessary to retain exclusive rights to the site.

Because of the similarity between the two standards,[17] the factors that have been used to determine whether to grant exclusive salvage rights are also pertinent here. Courts generally look at a number of factors in making this determination. In *Hener*, the court considered the time when each group began their labors, the duration of each groups' tangible salvaging activity, the comparative skill and quality of the competing groups, the salvors' investments in capital and labor, and the likelihood of success of each of the parties. *Hener*, 525 F.Supp. at 359. In addition, as recognized by the court in *MDM Salvage*, special consideration should be paid to the historical nature of the wreck. 631 F.Supp. at 310. There the court considered the salvors' independent, historical research about the wreck(s), the salvors' preservation of the archaeological integrity of the wreck site, the parties' on-site photography of the wreck site(s), and the salvors' marking of sites, as well as the parties' good faith salvage activities and their "sustained and significant commitment to salvage the purported wreck site." *Id.; see also AN-DREA DORIA*, 836 F.Supp. at 1107 (relying extensively on the *MDM Salvage* factors, and considering plaintiff's "near-term ability to salvage the wreck," his historical research, his capital investments into the salvage operation, and his still and video photography of the site); *BROTHER JONATHAN*, 883 F.Supp. at 1363 (requiring the salvor in possession to describe its archaeological preservation activities when applying for an extension of time of its exclusive salvage rights); 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 16–7, at 346 (2d ed. 1994) (submitting that the law of salvage, state and federal statutes, and international conventions "should be interpreted as requiring both a salvor and a finder of historic shipwreck to use proper archaeological techniques to preserve the scientific, historic, and archaeological integrity and provenance of the wreck"); *cf. Columbus–America Discovery Group*, 974 F.2d at 468 (emphasizing that "the degree to which salvors worked to protect the historical and archaeological value of the wreck and items salved" is an important consideration in granting a salvage award). In sum, not only do courts consider the time, effort, and money that parties have invested in the salvage operation as well as their chances of success, but, where the vessel is of historic importance, they also weigh the salvor's archaeological preservation efforts.

Finally, although not of precedential value, the district court's findings and holding in *MAVIS* are also instructive. *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel*, No. 82–3742–S (D.Mass. Apr. 16, 1986), *aff'd*, 833 F.2d 1059 (1st Cir.1987) [hereinafter *MAVIS I* ]. The district court granted Martha's Vineyard Scuba Headquarters, Inc. (MVSHQ) exclusive salvage rights in 1983. *Id.* at 4. In that same year, MVSHQ completed the identification stage of its salvage plan and began its preliminary survey. *Id.* at 3. Nothing was done in 1984, and the preliminary survey was completed in 1985. *Id.* at 3–4. MVSHQ planned to begin its full scale survey in 1986. *Id.* Thus, MVSHQ had failed to salvage any item from the wreck, "accomplish[ing] little of note" while it had exclusive salvage rights. *MAVIS II*, 833 F.2d at 1061. On the other hand, the intervening salvor had completed a long survey of the wreck in 1985, had removed a few artifacts to identify the wreck, and was ready to go ahead with a thirty to forty day salvage dive in 1986, with the court's permission. *Id.* at 4–5. The district court held that MVSHQ, because it had been to the site only once during two diving seasons, had salvaged nothing from the wreck, and had no plans to salvage in 1986, had indeed been dilatory. Accordingly, the court allowed the second salvor to intervene and salvage the wreck, but, because of the time and energy MVSHQ had invested in the salvage operation, did not grant the second salvor exclusive rights. *Id.* at 8.

## B. RMST Has Acted as a Salvor-in-Possession

Joslyn claims that RMST is no longer entitled to exclusive salvage rights. He asserts

17. No court has, as yet, made any distinctions between the two standards.

that RMST cannot demonstrate that its efforts have been undertaken with due diligence, are ongoing, and are clothed with some prospect for success. His arguments are based primarily on the failure of RMST to mount an expedition to the wreck site during the 1995 diving season and on RMST's present financial situation which, he asserts, will result in RMST's inability to conduct a 1996 expedition. Joslyn also downplays the archaeological preservation activities of RMST, suggesting that without concurrent expeditions to the wreck site, they are irrelevant. In determining whether RMST should remain sole salvor in possession, the Court will address each prong of the *MAVIS II* standard in turn.

### 1. Due diligence

The due diligence inquiry—whether RMST has shown a level of salvage activity that is reasonable under the circumstances—focuses primarily on the salvor's past operations. *ANDREA DORIA,* 836 F.Supp. at 1107. There is no set formula with which to measure the due diligence of a salvor. As Joslyn admits, "the relevant case law does not specifically set forth the quality of presence necessary or the frequency of salvage activity required for a salvor to retain its status as a salvor-in-possession." Intervenor's Memo. at 17. Using both the general principles and the relevant factors discussed in part III.A, *supra,* the Court finds that RMST has satisfied the due diligence prong of the test.

This case deals with one of the most famous shipwrecks in history, and thus, the archaeological preservation of the wreck itself as well as the recovered artifacts is of extreme importance to this Court. In addition, unlike a majority of the wrecked vessels which are easily accessible to divers, the TITANIC lies two-and-a-half miles below the ocean surface and the use of a manned submersible is required to reach it. *See,*

*e.g., MAVIS II,* 833 F.2d at 1061 (ship is located three hundred feet under the surface); *BROTHER JONATHAN,* 883 F.Supp. at 1364 (wreck is close to the shore); *MDM Salvage,* 631 F.Supp. at 312 (vessel in question is a "shallow water ocean wreck"); *Hener,* 525 F.Supp. at 351 (wreck located between New Jersey and Staten Island). Consequently, the cost of financing an expedition to the wreck site may be exorbitant and result in a slow recovery of artifacts.

■ Contrary to Joslyn's assertions, the failure of RMST to dive in 1995 does not by itself indicate a lack of diligence on its part. Weather conditions in the North Atlantic Ocean permit expeditions only within a three month weather window. *See supra* part I. Thus, although Joslyn claims that RMST has failed to salve for eighteen months, in realistic terms, it has actually failed to salve for three months. In *MAVIS I,* the court found the salvor lacking in due diligence after it had failed to salvage the site for two successive diving seasons and had no plans to go down during the third. In the present case, the salvor has failed to salve for one diving season and is planning an expedition during the next weather window. As evidenced by the case law described in part III.A., *supra,* salvors may be temporarily absent from the wreck site; RMST's temporary absence from the wreck site, therefore, does not indicate a lack of dominion over the wreck.[18]

■ In comparing RMST's activities with those of other reported salvage operations and considering the difficulties in financing and organizing the expeditions required at this particular wreck site, the Court concludes that RMST's salvage activities are reasonable in the circumstances. RMST and its predecessors have organized expeditions in 1987, 1993, and 1994, and have recovered approximately 3,600 artifacts. The sheer quantity of artifacts recovered appears to be much larger than that reported by other

---

**18.** Joslyn's argument that the failure of RMST to leave a marker at the wreck site is further evidence that is has no control or dominion over the site is also unavailing. Although the *ANDREA DORIA* court may have considered this factor in its decision, 836 F.Supp. at 1103, the *Hener* court did not find this to be of great importance, 525 F.Supp. at 360. Here, where the salvors who

are capable of reaching the TITANIC are aware that RMST has exclusive salvage rights, there is no need to leave a copy of the Court's order in a waterproof container at the wreck site. Furthermore, the wreck site is spread over a large area and leaving a copy of the Court's order would be both useless and impractical.

salvors. *See,  e.g., MDM Salvage*, 631 F.Supp. at 313 (no artifacts of great significance were reported to be recovered); *Hener*, 525 F.Supp. 350 (no silver had apparently been salvaged). In addition, RMST has made significant capital investments in this venture and has hired extremely skilled divers to do the actual salvaging. *See Hener*, 525 F.Supp. at 364 (relying heavily on the parties' investments of time and money and the seriousness of the salvage operations). Moreover, RMST has been dedicated to the preservation of the archaeological integrity of the wreck site as well as the preservation of the retrieved artifacts. RMST has worked with a number of organizations to establish an International Advisory Committee whose purpose is to develop a strategy for safeguarding the TITANIC and the artifacts recovered from it. RMST has also hired a highly-qualified conservation company to preserve the artifacts. Finally, RMST has done more than merely preserve the site and the artifacts; it has made the artifacts available to the public through exhibitions, thereby benefiting the public more than the requisite at-site archaeological preservation could do. *See Columbus–America Discovery Group*, 974 F.2d at 450; *MDM Salvage*, 631 F.Supp. at 310. The Court also finds that, in a case such as this where the due diligence of a salvor in possession is at issue, the Court should compare both the salvor's representations as to its plans and the Court's expectations at the time the salvor was given exclusive rights with its actual accomplishments. In the original action, the Court used its discretion to grant RMST salvor-in-possession rights because it believed that granting exclusive rights would lead to the actual salvaging of the TITANIC and the use of the recovered artifacts in the public interest and additionally, would prevent a destructive "free-for-all" looting of the historical vessel. Furthermore, RMST promised the Court that it would keep the artifacts together and preserve them for the public. RMST's promises to the Court in this respect have been fulfilled. RMST has been a guardian of the TITANIC artifacts: it has recovered thousands of artifacts from the wreck site, has hired a qualified conservator to actively conserve and preserve artifacts, and has or-

ganized exhibitions, including a one-year exhibition at the world's foremost maritime museum. RMST has demonstrated to this Court that it is continuing to organize future exhibitions of the artifacts. Hence, the Court finds that RMST has maintained the duties expected of it as salvor in possession of the TITANIC.

■ Accordingly, from the preceding review of RMST's salvage operations, it is clear to this Court that RMST's efforts have been undertaken with due diligence.

### 2. Ongoing

■ RMST must next establish that its salvage operations are ongoing. The evaluation of whether a salvor's operations are "ongoing" focuses not only on past operations, but also on present intentions. *ANDREA DORIA*, 836 F.Supp. at 1107; *LUSITANIA*, 884 F.Supp. at 1051. Upon an objective evaluation of the facts, it is clear that RMST's present intention is to continue to salvage the wreck site.

■ RMST has successfully recovered numerous artifacts in the past and has stated its intention to continue to do so. It has a charter agreement with IFREMER to dive in August of this year. In addition, at the time of the hearing, RMST's marketing partner stated that it had spent a large amount of time and money advertising the two cruises to the site, and after a few weeks of sales, a significant amount of cabins had already been booked. As the case law discussed above has overwhelmingly emphasized, *see supra* part III.A, RMST's temporary absence from the wreck site in conjunction with its intention to return is not sufficient to support a finding that RMST has abandoned its salvage operations. *See* discussion *supra* part III.B.1 and cases described *supra* part III.A; *see also Hener*, 525 F.Supp. at 360 (salvor who temporarily left the wreck site with intention to return did not abandon its salvage operations; salvor needed to assemble the proper equipment himself because of its prohibitive cost). Finally, RMST's onshore activities, especially the exhibitions and the continued payment for conservation and preservation of artifacts, also indicate that

RMST is still committed to the salvaging of the TITANIC.[19] Thus, given these facts, RMST's efforts are sufficiently ongoing to merit the continuance of its status as salvor in possession.

### 3. Clothed with prospect of success

 Finally, RMST must also demonstrate that its efforts are clothed with a prospect of success. RMST and its predecessor in interest have made three successful expeditions to the TITANIC wreck site and have recovered over a thousand artifacts. Thus, "[t]hat these efforts have been 'clothed with success' can scarcely be denied." *ANDREA DORIA*, 836 F.Supp. at 1107. The only real question then is whether RMST has the financial capabilities to finance further salvage operations at the site. The evidence at the hearing indicated that although at this time RMST's financial condition leaves much to be desired, it has a number of sponsors and backers to lead the Court to expect a successful 1996 dive season.[20] In addition, RMST has the necessary contracts in place to secure both divers and equipment for the 1996 expedition.

The Court again emphasizes the fact that this is a highly speculative business and, because the artifacts are being conserved and preserved for the public welfare rather than sold to the highest bidder, it is more difficult to raise the large sums of money necessary for the expeditions to the wreck site. RMST must depend on exhibition income as well as inventive marketing ideas, such as coal sales and cruises to the site, as a primary source of financing. Nevertheless, the Court finds that the testimony indicates a strong probability for a successful 1996 expedition, thus clothing RMST with a prospect of success.

Accordingly, upon the consideration and application of the foregoing legal principles to the facts and circumstances of the present case, the Court concludes that RMST should

remain the sole salvor in possession of the TITANIC wreck site and **DENIES** Joslyn's motion requesting rescission of RMST's status.

### IV. CONCLUSION

For the above reasons, the Court **DENIES** Joslyn's Motion requesting rescission of the Court's prior Order granting RMST salvor-in-possession status. The Court does, however, *sua sponte* modify its Order of June 7, 1994 to require RMST to make more frequent periodic reports. .

The Clerk is **REQUESTED** to forward a copy of this Order to the counsel of record for the parties.

It is so ORDERED.

---

**19.** The Court does agree with Joslyn that if a salvor solely concerns itself with on-shore activities and shows no intention to continue salvaging the wreck site, the salvor should lose its exclusive salvage rights. .

**20.** The Court notes that a failure to complete a successful expedition during the forthcoming 1996 weather window may lead the Court to conclude that RMST's financial situation prevents it from being able to successfully salvage the site.